UNITED STATES of America,
Plaintiff-Appellee,

v.

Charles JACKSON, and Anthony
Wayne Browning,
Defendants-Appellants.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Michael RYAN, Defendant-Appellant.

Nos. 86–1226, 86–1381.

United States Court of Appeals,
Fifth Circuit.

Aug. 17, 1987.

Rehearings Denied Oct. 1, 1987.

Roddy L. Harrison, Pecos, Tex., for Jackson.

Lucien B. Campbell, Federal Public Defender, San Antonio, Tex., for Browning.

Sidney Powell, LeRoy Morgan Jahn, Asst. U.S. Attys., Helen M. Eversberg, U.S. Atty., San Antonio, Tex., for U.S.

Charles Louis Roberts, Joseph (SIB) Abraham, Jr., El Paso, Tex., for Ryan.

Before CLARK, Chief Judge, GEE, RUBIN, REAVLEY, POLITZ, RANDALL, JOHNSON, WILLIAMS, GARWOOD, JOLLY, HIGGINBOTHAM, DAVIS, HILL, and JONES, Circuit Judges.

REAVLEY, Circuit Judge:

The purpose of this en banc rehearing is to reconsider Fifth Circuit precedent deeming a checkpoint on an interstate highway at Sierra Blanca to be a "functional equivalent of the border." Appellants' drug law violations were discovered by full searches of their automobiles at this checkpoint. In one case capsules of a controlled substance were found in a cosmetics case in the car trunk; in the other case cocaine was found in a suitcase in the car trunk. Adhering to our prior decisions, a panel of this court upheld the appellants' convictions, and approved the searches at Sierra Blanca on the ground that this checkpoint is the "functional equivalent of the border." The en banc court now decides that the Sierra Blanca checkpoint should not have been regarded as a border equivalent. We further hold that the plenary searches presently conducted at the Sierra Blanca checkpoint are unreasonable under the Fourth Amendment. However, given the significant government interest in controlling illegal immigration, we consider the availability of area warrants that would allow inspections for illegal aliens at checkpoints near the border. Finally, we affirm the appellants' convictions because the instant searches were conducted in good faith reliance upon our earlier decisions.

I

**Functional Equivalence and The Sierra Blanca Checkpoint**

The circumstances responsible for bringing the appellants before this court have been recited previously, and need not be repeated here. *See United States v. Jackson*, 807 F.2d 1185, 1187–90 (5th Cir.1986); *United States v. Oyarzun*, 760 F.2d 570, 572–73 (5th Cir.1985). Instead, we begin by telling how the Fifth Circuit developed its own functional equivalent for controlling Fourth Amendment law.

The Supreme Court first coined the phrase "functional equivalent" of the border in *Almeida-Sanchez v. United States*, 413 U.S. 266, 272–73, 93 S.Ct. 2535, 2539, 37 L.Ed.2d 596 (1973), describing two possible examples as follows:

[S]earches at an established station near the border, at a point marking the confluence of two or more roads that extend from the border, might be functional equivalents of border searches. For another example, a search of the passengers and cargo of an airplane arriving at a St. Louis airport after a nonstop flight from Mexico City would clearly be the functional equivalent of a border search.

The *Almeida-Sanchez* Court did not otherwise explain the meaning of this new concept, nor has the Court since elaborated its

understanding of what types of check-points qualify as functionally equivalent to the border. The circuit courts, however, have examined in some detail the notion of functionally equivalent borders. In this section we consider the Fifth Circuit's use of the term.

The Sierra Blanca checkpoint served as the proving ground for this court's first interpretation of the phrase "functional equivalent" of the border in *United States v. Hart*, 506 F.2d 887 (5th Cir.) (*Hart I*), *vacated and remanded*, 422 U.S. 1053, 95 S.Ct. 2674, 45 L.Ed.2d 706 (1975), *reaff'd on remand*, 525 F.2d 1199 (5th Cir.) (*Hart II*), *cert. denied*, 428 U.S. 923, 96 S.Ct. 3234, 49 L.Ed.2d 1226 (1976).[1] The defendant in *Hart I* was arrested after a border patrol agent discovered approximately 397 pounds of marijuana in the trunk of his car following a routine search at the checkpoint. The *Hart I* court interpreted the Supreme Court's functional equivalency concept broadly, believing that it referred

to the same permanent checkpoints for which we had long upheld warrantless searches for illegal aliens. 506 F.2d at 889–92 n. 1 (see cites contained therein).[2] The court identified three characteristics that "transform" a checkpoint into the border's functional equivalent and make searches there *reasonable:* "the proximity of the checkpoint to the border, the permanent nature of the checkpoint and the hours of operation." *Id.* at 895. The original rationale for affixing the "functional equivalent" label to the Sierra Blanca checkpoint, therefore, did not depend on its functioning the same as actual border checkpoints where traffic is stopped as it enters the country; it was based on the reasonableness, under the Fourth Amendment, of stopping vehicles in the border region to check passengers' citizenship status under 8 U.S.C. § 1357(a)(3).[3] *Id.* at 894. The court explained as follows:

> [A]long much of the Mexican-United States border runs the Rio Grande River,

1. The *Hart I* court provided the following description of the Sierra Blanca checkpoint:

   The Sierra Blanca checkpoint is located approximately 75–85 miles southeast of El Paso, Texas, and 4 miles west of Sierra Blanca, Texas, on Interstate Highway 10. [Interstate Highway 10 runs along the entire southern rim of the United States, connecting Los Angeles, California and Pensacola, Florida.] Leaving El Paso Interstate 10 parallels the United States-Mexico border in a southeasterly direction for approximately 50 miles, coming within two miles of the border itself at many places. Before reaching the checkpoint, Interstate Highway 10 turns in a northeasterly direction away from the border with the result that, at the checkpoint itself, the highway runs in an east-west direction.

   . . . .

   The Sierra Blanca checkpoint itself is situated 20 land miles and 14 air miles from the United States-Mexico border.

   . . . .

   The Sierra Blanca checkpoint is permanent in nature. Approximately one mile west of the checkpoint on Interstate Highway 10, there is a sign which reads, "Inspection station, all vehicles exit one mile." Somewhat closer to the checkpoint, between one-half and three-fourths of a mile west, a second sign reads, "Form one lane right." One thousand yards west of the checkpoint, a third sign states, "Inspection station, all vehicles right lane."
   506 F.2d at 896.

2. In *Hart II*, after reconsidering its earlier judgment in light of *United States v. Ortiz*, 422 U.S. 891, 95 S.Ct. 2585, 45 L.Ed.2d 623 (1975), and *United States v. Brignoni-Ponce*, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975), the court concluded that its "decision that the Sierra Blanca checkpoint is the functional equivalent of the border means that the non-probable cause search in this case was a valid border search which met the Fourth Amendment requirement of reasonableness."

3. Section 1357(a) provides in pertinent part as follows:

   Any officer or employee of the Service authorized under regulations prescribed by the Attorney General shall have power without warrant—

   . . . .

   (3) within a reasonable distance from any external boundary of the United States, to . . . search for aliens . . . [in any] vehicle . . ., for the purpose of patrolling the border to prevent the illegal entry of aliens into the United States.

   The corresponding regulations define "reasonable distance" to mean "within 100 air miles from any external boundary of the United States." 8 C.F.R. § 287.1(a)(2) (1987). *See also* 8 U.S.C. § 1225(a) (At the border, "[i]mmigration officers are authorized and empowered to board and search any vessel, aircraft, railway car, or other conveyance, or vehicle in which they believe aliens are being brought into the United States.").

which, in spite of a name indicating contrary magnificence, can be driven across, waded across, and easily swim across at all times, and much of the time can be walked across without wetting a foot. With so much access to a highway parallel to the border by aliens who could easily have walked across the border, we think the Fourth Amendment rule of reason would permit a search for those aliens of vehicles that may have taken them aboard after their arrival by other means within our boundaries. With almost 2000 miles of Mexican border from Brownsville, Texas to San Diego, California, contiguous to four of the states of the Union, the impracticality of guarding every part where human crossing could be made should be so apparent as to make inexorably reasonable some method of curtailing illegal entry such as established at the Sierra Blanca checkpoint.

*Id.* at 897.

The next important Fifth Circuit case to consider what kind of checkpoint merits functional equivalency status was *United States v. Alvarez-Gonzalez,* 542 F.2d 226 (5th Cir.1976) (*Alvarez-Gonzalez I*), a case concerned with a checkpoint at La Gloria, Texas. The *Alvarez-Gonzalez I* court adopted a tripartite test for determining functional equivalency: (1) the ratio between international and domestic traffic passing through such checkpoints must not be disproportionately domestic; (2) it must be a permanent checkpoint; and (3) as to international traffic, it must approximate the effect of one physically located at the border. *Id.* at 229. The test prescribed in *Alvarez-Gonzalez I* appeared to narrow the *Hart I* test somewhat, by limiting functional equivalent of the border checkpoints to ones interdicting predominantly "international traffic." On remand, the district court found that the La Gloria checkpoint merited functional equivalency status under the *Alvarez-Gonzalez I* test, and we affirmed. *United States v. Alvarez-Gonzalez,* 561 F.2d 620 (5th Cir.1977) (*Alvarez-Gonzalez II*).

Following the court's earlier remand, the border patrol conducted a survey to assess the ratio of international to domestic traffic passing through the checkpoint. The survey indicated that sixty percent of this traffic was international in origin. Significantly, however, the survey included as "international traffic" vehicles that had originated in the "immediate border area" *on the American side.* The court defended the use of this measure as follows:

It would make little sense indeed to adopt a definition of "international" for this purpose which excluded those very journeys which evidence and practical experience have demonstrated are most likely to commence with an illegal international border crossing. In such situations, although the vehicle has not crossed the border, its cargo has.

*Id.* at 623–24.

By adopting a definition of international traffic that included domestic traffic, the *Alvarez-Gonzalez II* court, like *Hart I* before it, "struck a balance between the needs of law enforcement and the constitutional rights of residents near the Mexican border." *Id.* at 625. The court determined that the Fourth Amendment's rule of reason allowed the government at the La Gloria checkpoint to conduct "a cursory inspection for alien passengers limited to cavities large enough to contain a human form." *Id.* The court specifically noted, however, that a more intrusive search for contraband "could well result in the striking of a different balance in determining a checkpoint's status as a functional equivalent of the border." *Id.*

We returned to the Sierra Blanca checkpoint in 1979 to consider the constitutionality of a search that uncovered 138 pounds of marijuana in the trunk of an MGB sports car. *United States v. Luddington,* 589 F.2d 236, 237 (5th Cir.), *cert. denied,* 441 U.S. 936, 99 S.Ct. 2061, 60 L.Ed.2d 666 (1979). Relying on *Hart I* and *Alvarez-Gonzalez II,* the *Luddington* court upheld the constitutionality of the search on the basis of the continuing need to carefully monitor the border area in order to intercept aliens who had recently crossed the border unchecked. The court also observed that the checkpoint only minimally affects domestic traffic, but at the same

time reiterated the need for a definition of international traffic not limited to traffic which has crossed the border, "since vehicles which remain in this country and await their illegal human cargo are a principal means of alien smuggling." *Id.* at 241.

For the first time in *Luddington,* however, we upheld a search of compartments too small to hide an illegal alien. The border patrol agent there could only open the small MGB trunk a few inches, because of a luggage rack, but far enough to know that no illegal aliens were hidden inside. The agent was able to observe several packages wrapped in plastic, which led him to refer the vehicle to a secondary inspection area where the marijuana was discovered. The authority for the search derived solely from the checkpoint's status as a border equivalent; probable cause was not raised as an alternative ground to support the search. Although the *Luddington* court purported to follow the rule of *Alvarez-Gonzalez II,* it did not comment upon the intrusiveness of the search, which went significantly beyond any of the checkpoint searches previously approved by this court. For the first time in *Luddington,* therefore, the court invested agents at the Sierra Blanca checkpoint with the same authority to search that agents possess at the nation's border, based solely on the checkpoint's designation as a border "equivalent," but without any independent assessment of the reasonableness of the searches themselves.

Any doubts about the scope of the government's power to search at the Sierra Blanca checkpoint were answered in *United States v. Dreyfus-de Campos,* 698 F.2d 227 (5th Cir.1983), where we upheld a search of a shaving kit. The court held, " '[i]t is not required that the underlying facts concerning a particular checkpoint location be proved over and over again in each case arising out of the same checkpoint location, so long as such facts remain unchanged.' " *Id.* at 229 (quoting *United States v. Salinas,* 611 F.2d 128, 130 (5th Cir.1980)). Finding no evidence to suggest changed circumstances since *Luddington,* the court upheld the constitutionality of the

search. Once again, however, the court did not analyze the justification for the searches being conducted at the Sierra Blanca checkpoint, which fully matched those conducted at the border.

More recently, panels of this court have again upheld the constitutionality of complete searches at the Sierra Blanca checkpoint on the basis of its status as a border equivalent. *United States v. Oyarzun,* 760 F.2d 570, 576 (5th Cir.1985); *United States v. Jackson,* 807 F.2d 1185, 1190 (5th Cir.1986). As the panel opinion in the present case flatly stated: "The established law is clear. Searches at the Sierra Blanca checkpoint are the functional equivalent of border searches and meet the Fourth Amendment requirement of reasonableness." *Id.*

## II

### The Fourth Amendment and Functional Equivalents of The Border

As the cases described in the previous section indicate, this circuit's designation "functional equivalent of the border" has been founded on the Fourth Amendment's "rule of reason," in light of the "staggering" problem of aliens entering the United States illegally, and with the impossibility of stemming this illegal tide by patrolling the full length of the nation's expansive southern border with Mexico cited as justification for searches away from the border. However, contrary to the "exigent circumstances" analysis of our cases, the constitutionality of searches conducted at a border equivalent does not depend on a Fourth Amendment analysis. Searches at checkpoints functionally equivalent to the border are premised upon the same principles supporting similar searches at the border itself, *Almeida-Sanchez,* 413 U.S. at 272, 93 S.Ct. at 2539; and "the 'border search' exception is not based on the doctrine of 'exigent circumstances' at all." *United States v. Ramsey,* 431 U.S. 606, 621, 97 S.Ct. 1972, 1981, 52 L.Ed.2d 617 (1977). In fact, border searches are not "embraced within the prohibition of the [Fourth] [A]mendment." *Id.* (quoting *Carroll v.*

*United States,* 267 U.S. 132, 150, 45 S.Ct. 280, 284, 69 L.Ed. 543 (1925)). The constitutional basis for searches at border checkpoints is fundamentally different from the basis for "stops" at checkpoints in the interior of the United States. Our cases have erred in confusing the two.

In *Ramsey,* (now Chief) Justice Rehnquist, writing for the Court, explained the special analysis for border searches as follows:

> Border searches, then, from before the adoption of the Fourth Amendment, have been considered to be "reasonable" *by the single fact that the person or item in question had entered into our country from outside.* There has never been any additional requirement that the reasonableness of a border search depended on the existence of probable cause. This longstanding recognition that searches at our borders without probable cause and without a warrant are nonetheless "reasonable" has a history as old as the Fourth Amendment itself.

431 U.S. at 619, 97 S.Ct. at 1980 (emphasis added). *See also United States v. Montoya de Hernandez,* 473 U.S. 531, 554–55, 105 S.Ct. 3304, 3318, 87 L.Ed.2d 381 (1985) (Brennan, J., dissenting) ("the power of Congress to authorize wide-ranging detentions and searches [at the border] *for purposes of immigration and customs control* is unquestioned") (emphasis in original).

The Supreme Court's approval of searches at checkpoints functionally equivalent to the border is based on this same principle, the only difference being that through necessity or convenience *border* searches are condoned away from the border. It is the *single fact* that the individual or item has entered this nation from outside that justifies the search. *Montoya de Hernandez,* 473 U.S. at 537–38, 105 S.Ct. at 3309. The Court in *Carroll v. United States,* 267 U.S. at 154, 45 S.Ct. at 285, explained why such border searches are reasonable:

> Travelers may be so stopped in crossing an international boundary because of national self-protection reasonably requiring one entering the country to identify himself as entitled to come in, and his belongings as effects which may be lawfully brought in. But those lawfully within the country, entitled to use the public highways, have a right to free passage without interruption or search unless there is known to a competent official authorized to search, probable cause for believing that their vehicles are carrying contraband or illegal merchandise.

■■■ By including domestic traffic in our definition of international traffic,[4] our cases have perverted the limiting principle inherent in the border search exception. The government's power to stop and examine vehicles crossing into this country derives solely from the sovereign's right of self-protection. *Ramsey,* 431 U.S. at 616, 97 S.Ct. at 1978; *see generally* Note, *Functional Equivalents of The Border, Sovereignty, and The Fourth Amendment,* 52 U.Chi.L.Rev. 1119 (1985). Motorists lawfully travelling on this nation's roadways

---

**4.** A survey conducted by the Federal Public Defender's Office between January 8 and January 15, 1986 found that an overwhelming number of motorists passing through the Sierra Blanca checkpoint had begun their trip in the United States or had been previously inspected at a port of entry or other checkpoint. The survey asked drivers to identify the point of origin of their present trip; and if that point was outside the United States, the surveyor asked the respondent whether he had already been stopped and inspected at a port of entry into this country or at some other checkpoint. The panel opinion correctly expressed serious reservations concerning the reliability of the conclusions drawn from the survey. The panel explained that "[t]he questions inquired as to the origin of a driver's journey, not as to whether the journey took him across the border. The irrelevance of the answer to the former question is demonstrated by the five drivers who stated that their point of origin was Hawaii." *United States v. Jackson,* 807 F.2d 1185, 1188 n. 4 (5th Cir.1986). Of course, in light of this circuit's definition of "international traffic," asking whether the motorist had just come across the border also would have been improper. Nonetheless, if the nature of traffic is in doubt on a roadway being considered for a functional equivalent of the border checkpoint, a survey with well crafted questions could be a very useful tool. *See generally* Monahan & Walker, *Social Science in Law* (1985).

are clothed with Fourth Amendment protection from arbitrary government interference. Therefore, only searches of persons or effects that have crossed the border may be deemed functionally equivalent to border searches and hence be excepted from the Fourth Amendment's compass. This limitation is consistent with the interpretation other circuits have given the functional equivalency notion. *See e.g., United States v. Garcia*, 672 F.2d 1349, 1365 (11th Cir.1982) (Functional equivalent of the border "searches are truly border searches because their sole justification is the fact that the border has been crossed."); *accord United States v. Sugrim*, 732 F.2d 25, 29 (2d Cir.1984); *United States v. Caminos*, 770 F.2d 361, 364 (3d Cir.1985); *United States v. Bilir*, 592 F.2d 735, 742 n. 11 (4th Cir.1979); *United States v. One (1) 1966 Beechcraft Baron, No. N242BS*, 788 F.2d 384, 388 (6th Cir.1986); *United States v. Carter*, 592 F.2d 402, 404 (7th Cir.1979); *United States v. Udofot*, 711 F.2d 831, 839 (8th Cir.1983); *United States v. Whiting*, 781 F.2d 692, 695 (9th Cir.1986); *United States v. Mayer*, 818 F.2d 725, 727 (10th Cir.1987); *Jasinski v. Adams*, 781 F.2d 843, 846 (11th Cir.1986). In fact, cases in this circuit considering functional equivalent of the border searches as they pertain to individual searches of persons or effects also hold that an actual border crossing must have occurred to justify a search.

In *United States v. Amuny*, 767 F.2d 1113 (5th Cir.1985), for example, customs agents electronically tracked a plane they suspected of being used to smuggle drugs as it left Galveston, but subsequently lost it around Palacios, Texas, a town on the coast of the Gulf of Mexico. The next day agents picked up the plane around Palacios, and tracked it as it returned northward to Galveston. When the plane landed, customs agents searched it and found marijuana on board. At the suppression hearing, the officers explained that they based the search on their "suspicion" that the plane had crossed the border. The panel held that suspicion alone could not support the search: "To justify a search at the functional equivalent of the border, agents must demonstrate to a 'reasonable certainty' that the vehicle has, *in fact, crossed the international border.*" *Id.* at 1123 (emphasis added); *see also United States v. Niver*, 689 F.2d 520, 526 (5th Cir.1982); *United States v. Barbin*, 743 F.2d 256, 261 (5th Cir.1984); *United States v. Melendez-Gonzalez*, 727 F.2d 407, 411 (5th Cir.1984). The mere opportunity to have crossed the border is not enough. *Amuny*, 767 F.2d at 1124; *see United States v. Brennan*, 538 F.2d 711, 715 (5th Cir.1976), *cert. denied*, 429 U.S. 1092, 97 S.Ct. 1104, 51 L.Ed.2d 538 (1977). The "reasonable certainty" test "require[s] something more than a showing of probable cause but something less than proof beyond a reasonable doubt" of a border crossing. *Amuny*, 767 F.2d at 1123; *Niver*, 689 F.2d at 526.

Although our checkpoint cases developed separately from the *Amuny* line of cases, the notion of border equivalence should be the same whether referring to searches of aircraft landing after crossing the border or at checkpoints located near the border, since their "reasonableness" emanates from the same source: the sovereign's historical right to inspect persons and effects entering the country. Indeed, searches of aircraft that have crossed the border and searches at checkpoints near the border were the very examples Justice Stewart cited in *Almeida-Sanchez* as possible border equivalents. Significantly, however, while he found the search of an "airplane arriving at a St. Louis airport after a nonstop flight from Mexico [to] *clearly be* the functional equivalent of a border search," he observed that searches conducted at checkpoints on roads "that extend from the border [only] *might be* functional equivalents of border searches." *Almeida-Sanchez*, 413 U.S. at 272–73, 93 S.Ct. at 2539 (emphasis added). The degree of certainty Justice Stewart expressed in the two examples derives from the relative certainty that a border crossing has occurred. Whereas a nonstop flight from Mexico has certainly crossed the border, vehicles travelling on roads leading away from the border may not have done so. Whether a checkpoint merits functional

equivalency status, therefore, depends entirely on the nature of the traffic passing through it. To justify searches at checkpoints labeled the functional equivalent of the border the government must demonstrate with "reasonable certainty" that the traffic passing through the checkpoint is "international" in character. *See United States v. Mayer,* 818 F.2d 725, 727 (10th Cir.1987); *United States v. One (1) 1966 Beechcraft Baron, No. N242BS,* 788 F.2d 384 (6th Cir.1986). In practical terms, this test means that border equivalent checkpoints intercept no more than a negligible number of domestic travelers. The government concedes that the Sierra Blanca checkpoint, and all similarly situated checkpoints, do not meet this test. We turn, therefore, to consider whether the searches now conducted at these checkpoints, though not border equivalent searches, may nevertheless be reasonable under the Fourth Amendment because of the public interests at stake.

### III

**The Fourth Amendment and Permanent Checkpoints**

As we noted above, and as the Supreme Court has repeatedly emphasized, the constitutionality of a particular government intrusion depends on its "reasonableness." *See e.g., Montoya de Hernandez,* 473 U.S. at 536–38, 105 S.Ct. at 3308–09; *United States v. Villamonte-Marquez,* 462 U.S. 579, 588, 103 S.Ct. 2573, 2579, 77 L.Ed.2d 22 (1983). "Thus, the permissibility of a particular law enforcement practice is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." *Delaware v. Prouse,* 440 U.S. 648, 654, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660 (1979). However, the Court has already conducted the necessary balancing test in the present context, and has discriminatingly calibrated the reasonable level of intrusiveness in light of the public interests at stake in these cases.

The government stresses, and our previous cases have recognized, the very serious problem of illegal aliens streaming into the

United States at unmonitored points along the border. *See, e.g., Alvarez-Gonzalez II,* 561 F.2d at 625 ("The magnitude of the problem of aliens illegally entering or remaining in the United States is staggering."). Yet the public interest in the present case is the same as that raised in all of the Supreme Court's border control cases: the "formidable law enforcement problem[ ]" of "[i]nterdicting the flow of illegal entrants from Mexico." *United States v. Martinez-Fuerte,* 428 U.S. 543, 552, 96 S.Ct. 3074, 3080, 49 L.Ed.2d 1116 (1976); *see also Almeida-Sanchez,* 413 U.S. at 273, 93 S.Ct. at 2540; *United States v. Brignoni-Ponce,* 422 U.S. 873, 878–79, 95 S.Ct. 2574, 2579, 45 L.Ed.2d 607 (1975); *United States v. Ortiz,* 422 U.S. 891, 892, 95 S.Ct. 2585, 2586, 45 L.Ed.2d 623 (1975). In *Brignoni-Ponce,* the Court summarized the problem as follows:

> [T]he public interest demands effective measures to prevent the illegal entry of aliens at the Mexican border.... [T]hese aliens create significant economic and social problems, competing with citizens and legal resident aliens for jobs, and generating extra demand for social services. The aliens themselves are vulnerable to exploitation because they cannot complain of substandard working conditions without risking deportation.

422 U.S. at 878–79, 95 S.Ct. at 2579. Despite the similarity between this case and the several Supreme Court checkpoint cases, the government urges this court to approve searches at permanent checkpoints far more intrusive than any so far sanctioned by the High Court.

In a case nearly indistinguishable from the present one, the Court in *Ortiz* considered the question "whether vehicle searches at [permanent] traffic checkpoints ... must be based on probable cause." 422 U.S. at 892, 95 S.Ct. at 2586. The checkpoint in *Ortiz* was located on the principal highway connecting San Diego and Los Angeles, approximately 62 air miles and 66 road miles north of the border. A routine immigration inspection at the checkpoint uncovered three illegal aliens secreted in the trunk of the defendant's

car. The government argued that the checkpoint's permanency distinguished its level of intrusiveness from the roving patrols found unreasonably intrusive in *Almeida-Sanchez*. 413 U.S. at 274, 93 S.Ct. at 2540. In particular, at permanent checkpoints motorists would not be frightened or annoyed by brief inspections, and officers had little discretion in deciding who to stop. The Court rejected these assertions, finding that "[t]he greater regularity attending the stop does not mitigate the invasion of privacy that a search entails." *Id.* 422 U.S. at 895, 95 S.Ct. at 2588. The *Ortiz* Court concluded, "[t]o protect that privacy from official arbitrariness, the Court always has regarded probable cause as the minimum requirement for a lawful search." *Id.* at 896, 95 S.Ct. at 2588.

The public interests cited by the government in this case are identical to the ones noted by the Supreme Court in *Ortiz*. The basic operation of the Sierra Blanca checkpoint, and especially its degree of intrusiveness, is the same as well. The only possible distinction may be that Sierra Blanca stands fourteen air miles from the Mexican border in Texas, whereas the San Clemente checkpoint reviewed in *Ortiz* was located sixty-two air miles from the Mexican border in California. This distinction, however, does not justify a different result. Enforcement officials at the Sierra Blanca checkpoint have been granted nearly free license. They exercise the power to choose which cars to search, without any obligation to articulate any reason for their choice. Such unbounded discretion creates the potential for significant abuse, since any vehicle or person may be stopped and searched for any reason, or no reason. *Ortiz*, 422 U.S. at 896, 95 S.Ct. at 2588.

In several early cases we suggested that allowing "a cursory inspection for alien passengers limited to cavities large enough to contain a human form" might strike a reasonable balance "between the needs of law enforcement and the constitutional rights of residents near the Mexican border." *Alvarez-Gonzalez II*, 561 F.2d at 625. Yet the very search found unconstitutional in *Ortiz* was a "routine immigration" search of a vehicle's trunk. Thus, the

Court has already passed judgment upon the inspections we contemplated in *Alvarez-Gonzalez*, and found them to be unreasonable. However, the *Ortiz* Court left open the question whether less intrusive checkpoint stops, "stops for the purpose of inquiring about citizenship," could pass constitutional muster. 422 U.S. at 898–99, 95 S.Ct. at 2589–90 (Rehnquist, J., concurring).

One year after *Ortiz*, the Court examined the constitutionality of checkpoint stops less intrusive than the immigration searches declared unconstitutional in *Ortiz*. In *Martinez-Fuerte*, the Court approved the brief detention of vehicles at permanent checkpoints so that occupants could be questioned regarding their right to be in the United States. 428 U.S. at 558, 96 S.Ct. at 3083. The Court also found referrals to secondary inspection areas for further questioning constitutional. *Id.* The Court explained that, although creating some inconvenience to the motoring public, a brief detention did not impermissibly intrude on individual privacy interests. The permanent nature of the checkpoint lessens the possibility that motorists will be taken by surprise, and officers at permanent checkpoints do not exercise the broad discretion found troubling in roving patrol stops. *See Brignoni-Ponce*, 422 U.S. at 882–83, 95 S.Ct. at 2580–81. Moreover, the intrusiveness of the stop is strictly limited, since "[n]either the vehicle nor its occupants are searched, and visual inspection of the vehicle is limited to what can be seen without a search." *Martinez-Fuerte*, 428 U.S. at 558, 96 S.Ct. at 3083.

Although cursory inspections of automobile trunks are less intrusive than complete searches, they are nonetheless searches under the Fourth Amendment. The Supreme Court has repeatedly emphasized that "[t]he principal protection of Fourth Amendment rights at checkpoints lies in appropriate limitations on the scope of the stop." *Martinez-Fuerte*, 428 U.S. at 566–67, 96 S.Ct. at 3087; *see Terry v. Ohio*, 392 U.S. 1, 24–27, 88 S.Ct. 1868, 1881–83, 20 L.Ed.2d 889 (1968); *Brignoni-Ponce*, 422 U.S. at 881–82, 95 S.Ct. at 2580–81. In

*Martinez-Fuerte,* the Court strictly limited the scope of stops at permanent checkpoints, specifically holding that "checkpoint searches are constitutional only if justified by consent or probable cause to search [and that] *'[a]ny further detention* must be based on consent or probable cause.'" 428 U.S. at 567, 96 S.Ct. at 3087 (quoting *Brignoni-Ponce,* 422 U.S. at 882, 95 S.Ct. at 2580) (emphasis added). Indeed, in every one of its many checkpoint and roving patrol cases, the Supreme Court has restricted the level of government intrusion to brief detentions only long enough to ask questions and check citizenship status. *See e.g., Villamonte-Marquez,* 462 U.S. at 592, 103 S.Ct. at 2581 (holding that random stops of vessels are reasonable because they "involve[ ] only a brief detention where officials come on board, visit public areas of the vessel, and inspect documents"). The Court has thus demarcated the boundary of privacy that officials at checkpoints cannot intrude without reason.

■ We might question whether limiting officers at permanent checkpoints to brief questioning of motorists frustrates law enforcement efforts. Checkpoint agents may stop and query motorists about their citizenship, and also request production of documents evidencing a right to be in the United States. *Martinez-Fuerte,* 428 U.S. at 559, 96 S.Ct. at 3083. Moreover, checkpoint agents may selectively refer motorists to secondary inspection areas for additional questioning without articulating any reason for doing so. *Id.* at 563–64, 96 S.Ct. at 3085. As demonstrated by their widespread use, these procedures provide an effective law enforcement tool in checking the tide of illegal immigration. *See id.* at 562 n. 15, 96 S.Ct. at 3085 n. 15. In practice, brief detentions at checkpoints increase agents' ability to identify illegal aliens by affording them a greater opportunity to scrutinize individual vehicles and their occupants, and thereby develop probable cause or obtain consent to support a search.

If removing the government's plenary power to search at permanent checkpoints does actually diminish effective enforce-

ment of the immigration laws, the Fourth Amendment balance between the government intrusion and the individual's privacy right under these circumstances has been struck by the Supreme Court in *Martinez-Fuerte,* and that is dispositive of the issue for us. Nonetheless, on several occasions the Court has noted the possible availability of an alternative, the "area warrant," that might allow the striking of a slightly different balance between the government's legitimate need to control the nation's border and motorists' protected right to travel in areas near the border without interference. We will therefore consider this alternative.

## IV

### "Area Warrants" and Permanent Checkpoints

In his concurring opinion in *Almeida-Sanchez,* Justice Powell compared the illegal alien problem along the border to the situation presented in *Camara v. Municipal Court,* 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967), involving housing code violations. The *Camara* Court held that administrative inspections of individual structures could be conducted on the basis of general knowledge about the area as a whole rather than specific knowledge concerning the condition of the particular building inspected. *See generally* Kress & Iannelli, Administrative Search and Seizure: Whither The Warrant?, 31 Vill.L. Rev. 705, 714–17 (1986). However, these "area inspections" had to be accompanied by a warrant unless a traditional exception, such as exigent circumstances, existed. *Camara,* 387 U.S. at 539, 87 S.Ct. at 1736. The Court explained that the Fourth Amendment's guiding principle of reasonableness required the striking of a careful balance between the need for the search and the limited invasion of privacy occasioned by administrative searches accompanied by a warrant. *Id.* at 535–37, 87 S.Ct. at 1734–35. Justice Powell, and at least four other members of the *Almeida-San-*

*chez* Court,[5] believed that the illegal alien problem in the border region presented an analogous situation to that in *Camara,* and one which might allow limited automobile searches by border patrol agents when supported by general knowledge of the area in question and an "area warrant." *See generally* Note, Area Search Warrants in Border Zones: *Almeida-Sanchez* and *Camara,* 84 Yale L.J. 355, 360–72 (1974).

In *Camara,* the Court cited three factors for its conclusion that administrative area inspections of property were reasonable under the Fourth Amendment. These factors included a " 'long history of judicial and public acceptance,' " the lack of other means to vindicate the public interest at stake, and the "limited invasion of privacy occasioned by administrative inspections which are 'neither personal in nature nor aimed at the discovery of evidence of crime.' " *Almeida-Sanchez,* 413 U.S. at 278, 93 S.Ct. at 2542 (Powell, J., concurring) (quoting *Camara,* 387 U.S. at 537, 87 S.Ct. at 1735). Justice Powell found these three factors similarly applicable to roving patrols for illegal aliens in the border region. First, up until *Almeida-Sanchez,* courts had consistently upheld roving automobile searches for aliens in border areas. *Id.* Second, no other effective method exists to ferret out illegal aliens as they move from the border into the interior of the United States. *Id.* And third, these searches resemble administrative searches in that their function "is simply to locate those who are illegally here and to deport them," not to uncover evidence for prosecutions. *Id.* Justice Powell identified two additional factors to reinforce his analysis. Foremost, these patrols are limited strictly to the border region where the high incidence of illegal alien traffic justifies the limited government intrusion. *Id.* at 279, 93 S.Ct. at 2542. Secondly, searches of

automobiles have traditionally been viewed as less intrusive than searches of persons or buildings. *Id.* Although Justice Powell suggested the use of "area warrants" to alleviate the constitutional deficiencies of roving border patrols, the concept applies equally to permanent checkpoints. *See Ortiz,* 422 U.S. at 897 n. 3, 95 S.Ct. at 2589 n. 3.

It is evident that the factors listed by Justice Powell as supporting border area searches of automobiles also formed the basis for the finding in our earlier cases that these searches were "reasonable" as "functional equivalent of the border searches." *See Jackson,* 807 F.2d at 1190; *Alvarez-Gonzalez II,* 561 F.2d at 622–26. However, unlike Justice Powell's proposal, our checkpoint cases failed to place effective restrictions on the power to search in the vicinity of the border. The functional equivalence label empowered agents at permanent checkpoints to fully search vehicles without articulating any reason for the search, and dependent only on the discretion of those charged with the law enforcement function. The pressure to discharge the law enforcement function too easily leads to the adoption of a narrow view of constitutionally protected rights. *See United States v. United States District Court,* 407 U.S. 297, 317, 92 S.Ct. 2125, 2136, 32 L.Ed.2d 752 (1972). Sensitive constitutional determinations ordinarily require the more dispassionate perspective offered by magistrates. By extending the Court's *Camara*-analysis to the border area, however, the power to search becomes subject to judicial oversight through the requirement that border area searches be accompanied by an "area warrant."

Only when "the burden of obtaining a warrant is likely to frustrate the governmental purpose behind the search" should

---

**5.** Although the four dissenting Justices in *Almeida-Sanchez* believed the searches involved there were reasonable as conducted, they noted that they also agreed with Justice Powell's assessment that these searches would be constitutional if carried out under the authority of an area warrant. 413 U.S. at 288, 93 S.Ct. at 2547 (White, J., dissenting). Justice White commented in addition that he "would expect that

such warrants would be readily issued." *Id.* Moreover, the Justices joining the majority opinion divided in their agreement with Justice Powell's concurrence. *Id.* at 270 n. 3, 93 S.Ct. at 2538 n. 3. Therefore, at least five, and perhaps as many as seven, Justices expressed some approval of area warrants in the context of enforcing the immigration laws.

the warrant requirement be dispensed with. *Camara*, 387 U.S. at 533, 87 S.Ct. at 1733. Nothing in the area warrant concept itself should cause such frustration, however. The government has acknowledged that the infiltration patterns of illegal aliens is well known, and, particularly east of Sierra Blanca, their routes into the interior of the United States are relatively few, thus making permanent checkpoints extremely effective. Since illegal immigration patterns are discoverable prior to the establishment of a checkpoint, and the geography of the area remains unchanged over time, judicial review of the reasonableness of proposed procedures should not ordinarily frustrate government action.

Justice Powell identified four factors bearing on the reasonableness of an area warrant in a given case:

> (i) the frequency with which aliens illegally in the country are known or reasonably believed to be transported within a particular area; (ii) the proximity of the area in question to the border; (iii) the extensiveness and geographic characteristics of the area, including the roads therein and the extent of their use, and (iv) the probable degree of interference with the rights of innocent persons, taking into account the scope of the proposed search, its duration, and the concentration of illegal alien traffic in relation to the general traffic of the road or area.

*Almeida-Sanchez*, 413 U.S. at 283–84, 93 S.Ct. at 2545. We consider only generally the application of these four factors to the permanent checkpoint at Sierra Blanca.

The first factor concerns the volume of illegal alien traffic in a particular area. The government has convincingly demonstrated the significant numbers of illegal aliens that consider I–10 through Sierra Blanca their highway to the interior of the United States. However, unlike the other three factors, this one has the potential to change over time. As the United States increases enforcement of the immigration

laws, and passes new measures making the trek north less attractive for those traveling illegally, the absolute number of illegal aliens may be expected to decrease accordingly.[6] Because the facts may change, the government should demonstrate that illegal immigration remains significantly great in the area in question to support renewal of the area warrant.

The second and third factors relate to the geographic characteristics of the area where the searches will take place. The geography surrounding Sierra Blanca, and in particular the stretch of roadway between El Paso and the checkpoint, strongly supports the propriety of the selected location. Leaving El Paso, the interstate runs parallel to the border for approximately eighty miles, at times passing as close as 200 yards, before turning northward toward the checkpoint, which is situated just fourteen air-miles from the border. All along this distance illegal aliens can steal across the border by swimming, wading and, in some areas, even walking across the Rio Grande River without ever meeting a border patrol agent. *See Hart I*, 506 F.2d at 897; *Luddington*, 589 F.2d at 240. Moreover, illegal aliens traveling north or east have little choice but to pass through the Sierra Blanca checkpoint on I–10. To the north of I–10 lies a remote region with few roads, all of which are monitored by the border patrol, and to the east I–10 cuts through the Quitman Mountains, effectively creating a funnel through which virtually all traffic must pass. The special nature of this area, therefore, makes placement of the checkpoint at Sierra Blanca particularly effective.

The final factor suggested by Justice Powell for consideration is the degree to which the search interferes with the lawful travel of innocent persons. The magnitude of the intrusion should be assessed in several ways. First, when reviewing a request for an area warrant, magistrates should carefully compare the volume of

---

**6.** In particular we note the passage of the Immigration Reform and Control Act of 1986 which is intended to lessen the volume of illegal alien traffic in the border region by removing much of the economic benefit associated with coming to the United States illegally. *See* 8 U.S.C. § 1324a (making employment of unauthorized aliens unlawful).

illegal alien traffic with the volume of lawful domestic traffic in the area in question. This comparison may be based on general information known about the area as a whole. However, when the government seeks to renew an area warrant, it should be required to convince the magistrate of the efficacy of the checkpoint searches, either because the operation has impeded the illegal traffic or apprehended a sufficient number of illegal aliens.

■ A second and more important measure of intrusiveness is the scope of the search. The original justification for border area searches comes from the analogy to administrative searches, i.e., searches "neither personal in nature nor aimed at the discovery of evidence of crime." *Camara*, 387 U.S. at 537, 87 S.Ct. at 1735. Searches aimed at discovering evidence of crime tend to be more intrusive than administrative searches. *See, e.g., Ingraham v. Wright*, 430 U.S. 651, 673–74 n. 42, 97 S.Ct. 1401, 1413–14 n. 42, 51 L.Ed.2d 711 (1977); *see generally* Note, The Civil and Criminal Methodologies of the Fourth Amendment, 93 Yale L.J. 1127, 1135–38 (1984). Moreover, the scope of the search should be strictly confined to the purposes justifying it. *See Terry v. Ohio*, 392 U.S. at 25–26, 88 S.Ct. at 1882 ("A search ... must ... be strictly circumscribed by the exigencies which justify its initiation."). Therefore, when the only government interest asserted is illegal immigration, the scope of border area searches must be limited to compartments large enough to secrete a person. We decline to comment on the issue of area warrants to sanction searches aimed exclusively at uncovering evidence of crime.

Again, we note that we are not entirely convinced that *Martinez-Fuerte*-type checkpoint operations fail to give the government an adequate mechanism by which to identify vehicles carrying illegal aliens. The brief detention of vehicles with observation and questions by an experienced officer provides a substantial enforcement tool. The government bears the burden to demonstrate not only that the public interest makes cursory inspections

reasonable; it must show that less intrusive methods cannot be effective enough to meet the public interests at stake. As we read a map in this record, there is a checkpoint located on I–10 west of El Paso and within New Mexico. Because New Mexico lies in the Tenth Circuit, the intrusion there is undoubtedly patterned to *Martinez-Fuerte*. A comparison of the consequences of that checkpoint, as well as those near the Mexican border but in the Ninth Circuit, would be useful.

## V

**Good Faith Reliance on Fifth Circuit Precedent**

■ Appellants urge this court to apply the exclusionary rule and suppress the evidence discovered during the searches we now deem illegal. *Weeks v. United States*, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914); *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). The primary purpose of the exclusionary rule "is to deter future unlawful police conduct and thereby effectuate the guarantee of the Fourth Amendment against unreasonable searches and seizures." *United States v. Calandra*, 414 U.S. 338, 347, 94 S.Ct. 613, 619–20, 38 L.Ed.2d 561 (1974). In *United States v. Leon*, 468 U.S. 897, 920–21, 104 S.Ct. 3405, 3419, 82 L.Ed.2d 677 (1984), however, the Court declined to apply the exclusionary rule to cases where an officer, acting in "objective good faith," had relied on a search warrant. Under such circumstances, the Court reasoned, the exclusionary rule would not deter police misconduct.

The *Leon* Court believed there was no sound reason for extending the exclusionary rule to deter misconduct on the part of judicial officers responsible for issuing search warrants. *Id.* at 915–18, 104 S.Ct. at 3417–18; *see also Illinois v. Krull*, —— U.S. ——, 107 S.Ct. 1160, 1166, 94 L.Ed.2d 364 (1987) (holding that the exclusionary rule does not apply where an officer acted in objectively reasonable reliance on a statute). The Court explained that there was "no evidence suggesting that judges and magistrates are inclined to ignore or sub-

vert the Fourth Amendment or that lawlessness among these actors requires application of the extreme sanction of exclusion." *Id.* 468 U.S. at 916, 104 S.Ct. at 3417. Moreover, exclusion would have no deterrent effect, since "[j]udges and magistrates are not adjuncts to the law enforcement team; as neutral judicial officers, they have no stake in the outcome of particular criminal prosecutions." *Id.* at 917, 104 S.Ct. at 3417. The reasoning of *Leon* fully applies to the case at hand. Panels of this court have upheld searches at the Sierra Blanca checkpoint numerous times, and appellants do not suggest that this court is "inclined to ignore or subvert the Fourth Amendment." *Id.* at 916, 104 S.Ct. at 3417. Under these circumstances,

> "[e]xcluding the evidence will not further the ends of the exclusionary rule in any appreciable way; for it is painfully apparent that ... the officer is acting as a reasonable officer would and should act in similar circumstances. Excluding the evidence can in no way affect his future conduct unless it is to make him less willing to do his duty."

*Id.* at 920, 104 S.Ct. at 3420 (quoting *Stone v. Powell,* 428 U.S. 465, 540, 96 S.Ct. 3037, 3073, 49 L.Ed.2d 1067 (1967) (White, J., dissenting)).

It follows from this holding that in other cases the exclusionary rule should not be applied to searches which relied on Fifth Circuit law prior to the change of that law on the date of the delivery of this opinion.

The appellants' convictions are AFFIRMED.

CLARK, Chief Judge, with whom GEE, JERRE S. WILLIAMS, and E. GRADY JOLLY, Circuit Judges, join concurring specially:

The words of the fourth amendment are direct and uncomplicated. "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated...." The constitutional touchstone—reasonableness—is grounded in fact, not labels. As the majority notes, the Supreme Court has made it clear that constitutional reasonableness is to be judged by balancing the individual's fourth amendment interests against legitimate governmental interests. That balancing convinces us these searches were constitutional.

### I.

At oral argument it was suggested that our prior labeling of Sierra Blanca as the functional equivalent of the border would enable officers to exercise the arbitrary power of strip or body cavity searches that are sometimes used at actual border inspection ports. No such case is presented to us today, nor has any such case ever been presented in the past. We recognize that the "functional equivalent of the border" label might deceive an irresponsible officer into exceeding the limits of reasonableness. This checkpoint is not the border. The balancing analysis required in today's cases indicates it is not functionally equivalent to the border in the context presented. We agree with the majority that our prior characterization of Sierra Blanca as a functional equivalent of the border is an improper generic label. We concur in overruling prior precedents which have applied it to decide the constitutionality of searches at Sierra Blanca.

### II.

Since the label "functional equivalent of the border," is not talismanic, this court must analyze the facts surrounding the particular search or seizure to be tested and make a balancing of public and private interests. The same reasoning, however, forbids a decision based on merely labeling Sierra Blanca as a "permanent checkpoint." Specifically, we disagree with the majority's conclusion that Supreme Court decisions regarding the checkpoints maintained at San Clemente, California, and at Sarita, Texas, fix the rights of citizen and government at Sierra Blanca, because we disagree with the factual and legal premises on which the conclusion is based.

### III.

The records in this case establish significant factual differences between Sierra

Blanca and other checkpoints involved in prior decisions. A description of the facts in these three cases best begins with a map of the area of the border in which Sierra Blanca functions:

In footnote 1, the majority quotes a general description of the Sierra Blanca checkpoint set out in *United States v. Hart.* A more complete description, extracted from the records in these cases, would show the following.

The checkpoint is strategically located on Interstate Highway 10—the only paved road leading from the border in this area—at a pass through the Quitman, Finlay, and Sierra Blanca Mountains which form a natural funnel for traffic into the checkpoint. The checkpoint was placed at this location to prevent pedestrians from walking around it. From El Paso, Interstate Highway 10 parallels the United States-Mexico

border in a southeasterly direction for approximately 60 miles, running as close as 200 yards to the Mexican border in El Paso and within a mile of the border in many other places. The checkpoint is manned by border patrol officers 24 hours a day, 365 days a year, subject only to manpower and weather condition interruptions. When the checkpoint is in operation, all eastbound traffic on Interstate Highway 10 is directed through it. Many commercial vehicles, known local residents and sufficient traffic to prevent hazardous traffic conditions from building up are waved through the checkpoint. Most of the vehicles that are stopped are detained very briefly for a check on the occupants' citizenship. Normally, only two Border Patrol officers work each shift at the checkpoint.

El Paso, a city of 500,000 people, faces the fifth largest city in Mexico—Juarez—across the Rio Grande River. Juarez has a population of 1,200,000. Large numbers of aliens enter the United States illegally in this area. A conservative estimate of the number of aliens entering the El Paso area illegally each day is 2,600, and the Border Patrol estimates that they apprehend only one in twelve. Annual figures for aliens who are illegally in the country and apprehended by the El Paso sector of the Border Patrol for 1983 were 205,944; for 1984, 212,654; and for 1985, 240,355. The 1986 figures on illegal and apprehended aliens ran 55% higher in January and February of 1986 than it had for those same months during 1985; 1,000 aliens were being apprehended per day in March 1986, when the hearing in this case occurred.

In addition to those who enter illegally, approximately 100,000 persons a day enter the United States from Mexico through the ports of entry in El Paso. The area between El Paso and the checkpoint and between the River and Interstate Highway 10 is very sparsely populated. Thirty-seven aerial photographs of the most frequently used sites at which aliens and contraband enter the United States in the area located between the western boundary of El Paso and the checkpoint were admitted in evidence. At each of these points, the Rio Grande River can be crossed with ease at all times of the year. All the paths from these sites feed into Interstate Highway 10. Several of these photographic exhibits depict the close proximity between Interstate Highway 10 and the Rio Grande River. In some of the photographs, tracks made by vehicle and pedestrian traffic can be seen leading from the border to the highway; furthermore, several of the photographs depict aliens actually wading across the River.

Within the city of El Paso, the Border Patrol has charted approximately 150 locations which were used between January 1983 and December 1985 as staging areas in the smuggling of loads of illegal aliens and contraband into the interior of the United States. These include private residences, motels, apartment complexes, all types of businesses, including commercial truck stops. Many, if not most, of these locations abut Interstate Highway 10 as it passes near the Rio Grande River in the city of El Paso. As the statistics for the checkpoint indicate, smugglers use virtually every kind of vehicle imaginable to smuggle their loads of aliens and contraband east on Interstate Highway 10 through the Sierra Blanca checkpoint because it is the most viable route east from the border in this area.

The number of criminal violators who are apprehended at the Sierra Blanca checkpoint is summarized in the following exhibit:

Sierra Blanca Checkpoint Statistics

| | 1983 | 1984 | 1985 |
|---|---|---|---|
| Number of violators apprehended | 4,518 | 4,510 | 3,767 |
| Number of deportable aliens apprehended | 4,083 | 4,181 | 3,461 |
| Number of alien-smuggling principals apprehended | 275 | 167 | 149 |
| Percentage of property seizures for the sector | 40% | 57% | 41% |
| Value of drug seizures | $1,200,000 | $2,896,952 | |
| Total value of seizures | $2,697,563 | | |
| Percentage of aliens apprehended at the checkpoint who entered illegally between El Paso and the checkpoint | 69% or 2,822 | 78% 3,254 | 70% 2,425 |

During the week of a survey made by the Public Defender, 51 illegal aliens, seven aliens smugglers, and 18 aliens who were

in the process of being smuggled were apprehended at the Sierra Blanca checkpoint. In addition, six seizures of narcotics and weapons were made and one stolen car was located.

Many significant cases have been made by officers at the Sierra Blanca checkpoint; indeed, Operation Chevron, which was the largest investigation into the use of commercial 18-wheeler trucks in the smuggling of aliens, resulted in the apprehension of the human cargoes of 22 tractor-trailer rigs at the Sierra Blanca checkpoint. Using a commercial truck stop located on Interstate Highway 10 within the city limits of El Paso as a staging area, the truckers were transporting illegal aliens, narcotics, and often weapons. This operation alone was smuggling over 300 aliens per month out of El Paso. In addition to the illegal aliens noted above, officers at the checkpoint also apprehended an escaped murderer, seized seven pounds of cocaine with a street value of $627,200, and three and a half pounds of amphetamine with a wholesale value of approximately $15,000 in just the first two months of 1986 when the survey was taken. Other examples of crimes routinely detected by the officers who man this border checkpoint were developed in the record.

## IV.

It cannot be doubted that the United States has the right to secure that portion of its border with Mexico lying between El Paso and Sierra Blanca in order to regulate the inflow of aliens and contraband over this stretch of the Rio Grande River. Though it would be a monumental affront to our friendly neighbor Mexico, no one could deny the United States had the legal right to erect an impregnable wall from El Paso to the Quitman Mountains, surmounted with suitable search lights, guard towers, and gun emplacements, and could man that wall with sufficient armed troops to achieve a positive prohibition of the illegal entry of persons or property in accordance with the laws of the United States governing immigration and import.

The adequate enforcement of those laws constitutes the public interest in this case. The question we are set to decide is whether the government can substitute for the elaborate, insulting, expensive effort described above the maintenance of a minimal inspection and search net across the mouth of a natural funnel of geographic and highway features that comprise the Sierra Blanca checkpoint in the manner shown by the facts of these three cases.

As stated, we have no disagreement with the majority's basic premise. Both of us know that fourth amendment reasonableness is a product of the balancing of this public interest with the intrusion which the inspection and search process in these cases brings to bear on the drivers, passengers, and vehicles that pass through this checkpoint. Our difference arises because we would abjure all labels—"functional equivalence" and "checkpoint" alike—and strike the balance on the record facts.

Because the geography of the United States is not homogenous, the rights of citizens that live in its different parts cannot be viewed as a uniform, seamless web. Fixed checkpoint inspections and roving patrol stops, which have been approved at San Clemente and Sarita, may not be permissible on the highways of Kansas or Iowa. Similarly, what is reasonable halfway between San Diego and Los Angeles or at a point 75 road miles north of Brownsville, Texas, does not fix the weight of the public interests at Sierra Blanca.

When the operator of a motor vehicle chooses to drive his car along an interstate highway which forms the most convenient collector for illegal aliens and cargo in the El Paso/Sierra Blanca area of the border, reasonableness dictates that he and his vehicle are subject to effective inspection and search even though that vehicle has not crossed the border. In the case of Sierra Blanca, he is fully notified that this inspection process will take place. The checkpoint is fully signed and has been regularly maintained for years.

## V.

None of the Supreme Court's "fixed checkpoint" or "roving patrol" cases

stamps these searches as unreasonable. In the first place, all other cases are distinctly different geographically and functionally. In testing the validity of the "inspections" made at San Clemente, the Court in *Ortiz* expressly noted that these inspections included portions of the car in which an alien might hide, typically including the trunk, under the hood and beneath the chassis. In cases of trucks, campers and the like, the inspection included enclosed portions as well. 422 U.S. at 894, footnote 1, 95 S.Ct. at 2587, footnote 1. While the *Ortiz* court forbade "searches" at San Clemente without consent or probable cause, it expressly noted that "not every aspect of a routine automobile 'inspection' as described in n. 1, supra, necessarily constitutes a 'search' for purposes of the Fourth Amendment. There is no occasion in this case to define the exact limits of an automobile 'search.'" 422 U.S. at 897, footnote 3, 95 S.Ct. at 2589, footnote 3. If all conditions at San Clemente were the same as at Sierra Blanca, which they aren't, the holding in *Ortiz* still would not directly control these cases.

*Brignoni-Ponce* involved a roving patrol stop near San Clemente. It required a balancing of governmental and private interests and detailed these particularized considerations for that balancing: (1) characteristics of the area; (2) proximity to the border; (3) actual patterns of traffic on the particular road; (4) previous experience with alien traffic; (5) information about recent illegal border crossings in the area; (6) drivers' behavior; (7) aspects of the vehicle, such as its size and apparent load; (8) appearance of occupants. When these eight considerations are applied to the searches in today's cases, we find that the geographic and highway characteristics of the area made Sierra Blanca the ideal spot to detect violations of the customs and immigrations laws committed in the sparsely populated region of the border between El Paso and Sierra Blanca. The highway operates as a collector of illegal traffic headed east and the mountains form a natural choke-point preventing by-pass. While the checkpoint itself is several miles from the border, its location is well designed to interdict border violations. The patterns of traffic on the road show much legal traffic, both of a local and domestic nature; however, this legal flow is a part of the mask which smugglers and drug runners use to cover their crimes. Previous experience with alien traffic shows the efficacy of the checkpoint's location and operation. Information about recent illegal border crossings in the area is overwhelming. The behavior of both drivers in these cases raised suspicion. The aspects of the vehicle were unremarkable, as were the appearance of the occupants. Rather than being a contrary precedent, *Brignoni-Ponce* strongly augurs for affirmance here.

*Martinez-Fuerte* dealt with checkpoint inspections at San Clemente and Sarita. Its balance of public and private interests was developed by considering whether important highways offered aliens a quick and safe route into the interior; whether routine checkpoint inquiries would apprehend many smugglers and illegal aliens; whether generating concern or even fright on the part of the traveling public would be appreciably lessened at a permanent checkpoint which had been selected by supervisory officials to make the most effective use of limited enforcement resources; the degree of interference with the general motoring public by the practices adopted for operation of the checkpoint; and the diminished expectation of privacy in the operation of automobiles as opposed to the expectation of privacy and freedom in one's own residence.

Sierra Blanca is quintessentially a site where an important highway offers aliens and drug runners a quick and safe route into the interior if effective inspection and search is proscribed. Routine checkpoint inquiries may apprehend some few smugglers and illegal aliens, but trailer-truck and boxcar loads will pass through undetected when the right to search the vehicle is suspended. Turning Sierra Blanca into a roadside conversation spot deprives it of most of its efficacy. Clearly, the notice given by official signs and the permanence of the checkpoint give it a regular and official status that should dispel concern or

fright on the part of the legal members of the traveling public. Perhaps the greatest weight in the public interest scale is the effective use of limited enforcement resources effected by the placement and operation of this facility. It enables two men to accomplish what would otherwise require thousands of people. The degree of interference with the general motoring public is minimal. Most cars are waived through. Local traffic is always passed and officers are instructed to avoid backlogs. The diminished expectation of privacy by a motorist who chooses to use this route is obvious.

## VI.

Individual appraisals of reasonableness are also the basis for the rationale of the most recent opinions of the Supreme Court regarding a warrantless "inspection" of an automobile junkyard and a warrantless search of a probationer's residence. *New York v. Burger,* —— U.S. ——, 107 S.Ct. 2636, 96 L.Ed.2d 601 (1987) and *Griffin v. Wisconsin,* —— U.S. ——, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987). In *Burger* the Court began its reasoning by recognizing that the fourth amendment's prohibition on unreasonable searches and seizures applied to the commercial premises there involved and that the operator of the business had an expectation of privacy. However, the Court held that the warrantless inspection of those premises could be reasonable when three criteria were met: first, when there was a substantial government interest that informed the regulatory scheme pursuant to which the inspection was made; second, when the warrantless inspections were necessary to further the regulatory scheme; third, when the certainty and regularity of the application of the inspection program provided a constitutionally adequate substitute for the warrant by advising the owner that the search was being made pursuant to law and that the regulations under which it was made limited the discretion of the inspecting officers as to time, place and scope.

Each of *Burger's* criteria is met at Sierra Blanca. The interest of the government in controlling its borders to enforce the laws prohibiting the illegal entry of aliens and contraband is certainly as substantial an interest as the regulation of automobile junkyards. Second, the factors which inform the maintenance of a fixed checkpoint at Sierra Blanca—characteristics of the area, proximity to the border, previous experience with alien traffic, knowledge of recent illegal crossings and importations, and the impracticability of maintaining an alternative defense—demonstrate that the inspections of persons and vehicles at Sierra Blanca is necessary to further the regulatory scheme. Finally, every motorist approaching the checkpoint is clearly advised that if he chooses to proceed through the checkpoint he will be subjected to inspection and search designed to detect illegal aliens and contraband. The fact that this inspection and search will only be made when the motorist drives through, will only be made at the Sierra Blanca permanent checkpoint, and will only be made in accordance with routines fixed by supervising officials, limits the time, place and scope of the action. The specific facts connected with the searches of Jackson, Browning, and Ryan, described in the panel opinions in these cases, demonstrate the complete reasonableness of the officers' actions.

In *Griffin,* the Court began its analysis with the concession that a probationer's home, like anyone else's, was protected by the fourth amendment requirement that searches be reasonable and be subject to the requirement of a warrant except when special needs made warrants or probable-cause requirements impracticable. The Court noted that exceptions had been permitted for warrantless, work-related searches of employees' desks and offices by government employers and supervisors; for searches of student property by school officials; and for searches conducted by government inspectors pursuant to regulatory schemes such as was present in *Burger* and similar cases. The Court held that in determining whether special needs of the probation system justified the search of probationer's home on an uncorroborated tip, it would look to the practices of the officers involved under the interpretations

of the governing court. The *Griffin* Court found that a warrant requirement would interfere with the probation system by letting a magistrate rather than a probation officer be the judge of how close the probationer's supervision should be. It pointed out that without the right to search, the probationer would be assured that so long as his illegal activities were sufficiently concealed as to give rise as to no more than reasonable suspicion, they would go undetected and uncorrected. In those circumstances, the Court found it was both unrealistic and destructive of the probation relationship to insist upon a showing of probable cause or the issuance of a warrant to search the probationer's home.

These same factors are applicable to weighing the governmental interest in the protection of the border against the rights of a motorist to operate a vehicle along the unique collector highway that runs into the mountainous funnel at Sierra Blanca.

We live in a society that searches citizens without warrants when they choose to use air carriers for domestic transportation, and when they elect to enter public buildings or other areas where restricted activities are conducted. The constitutional test for such searches is reasonableness. It is a test that can be administered only by weighing the facts of the situation in which the search is conducted in the public/private balance. The searches of these three defendants at Sierra Blanca passed the test.

## VII.

The majority holds that the Border Patrol should follow the suggestion contained in some opinions of the Supreme Court which speculate that an "area warrant" procedure might supply constitutional reasonableness to searches made by roving patrols and at fixed checkpoints other than Sierra Blanca. Our view that procedures now employed at Sierra Blanca in these cases was constitutional would make this conjecture unnecessary here. We would only observe that the information which should be furnished to a magistrate to obtain such an "area warrant" would be the same information now utilized by Border Patrol officers in directing the present operations at Sierra Blanca. This exercise would substitute the magistrate for the experienced Border Patrol supervisors. This is precisely what the Court refused to do in *Griffin* in the magistrate-probation officer context. Given the fact that such a warrant would operate on unknown motorists in future situations which could only be predicted, it seems probable to us that the issuance of such a warrant could add to rather than detract from the intrusion on personal rights of motorists passing through the checkpoint. If the "area warrant" may only authenticate searches for aliens, it also would deprive the public interest of a significant degree of protection which our balancing would require.

Because we disagree with the holdings of the majority that these searches were unconstitutional, we concur in its conclusion that appellants' convictions should be affirmed.

ALVIN B. RUBIN, Circuit Judge, concurring:

As in *Illinois v. Krull*,[1] our opinion fails to provide an "effective remedy ... in the very case in which the [search] at issue [is] held unconstitutional." That result, however, is ordained by the Supreme Court opinions in both *Krull* and *United States v. Leon*.[2] The majority opinion in both cases considered and rejected the argument that a defendant who has successfully challenged the constitutionality of state action should receive the benefit of suppression of the evidence unconstitutionally seized.[3] Concurring in the remainder of the opinion, I therefore concur also in Part V although I would, if not bound by Supreme Court

1. —— U.S. ——, 107 S.Ct. 1160, 1177, 94 L.Ed.2d 364 (1987) (O'Connor, Jr., dissenting).

2. 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984).

3. *Krull*, 107 S.Ct. at 1169 n. 11; *Leon*, 468 U.S. at 924 & n. 25, 104 S.Ct. at 3421 & n. 25.

precedent, reach a contrary decision as to the suppression of the evidence in this case.

GARWOOD, Circuit Judge, concurring:

I concur in Judge Reavley's excellent opinion, and append these comments merely to note that I would prefer the approach taken by Chief Judge Clark, at least as to searches for illegal aliens, if I believed it were open to us.

As both Judge Reavley and Chief Judge Clark demonstrate, there is a compelling national interest in workable measures for the control of illegal immigration along our southern border. A nation that cannot control its immigration is "to that extent subject to the control of another power." *Chae Chan Ping v. United States*, 130 U.S. 581, 9 S.Ct. 623, 629, 32 L.Ed. 1068 (1889). We should be slow to "convert the constitutional Bill of Rights into a suicide pact." *Terminiello v. City of Chicago*, 337 U.S. 1, 69 S.Ct. 894, 911, 93 L.Ed. 1131 (1949) (Jackson, J., dissenting).

Given the automobile exception to the warrant clause, *see Carroll v. United States*, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925); *California v. Carney*, 471 U.S. 386, 105 S.Ct. 2066, 2068–70, 85 L.Ed.2d 406 (1985), the provisions of 8 U.S.C. § 1357(a) and 8 C.F.R. § 287.1(a)(2), and the general reasoning employed to sustain appropriately located fixed checkpoint stops and questioning for immigration control purposes without individualized suspicion, *United States v. Martinez-Fuerte*, 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976), I would have thought that vehicular searches for illegal aliens under like conditions also met the requirements of the Fourth Amendment without the necessity of a prior warrant for the particular checkpoint. Moreover, use of such a warrant seems to undesirably stretch the meaning of the warrant clause, given its language and history. *See Griffin v. Wisconsin*, — U.S. —, —, 107 S.Ct. 3164, 3168–71, 97 L.Ed.2d 709 (1987).

Nevertheless, I am unable to read *United States v. Ortiz*, 422 U.S. 891, 95 S.Ct. 2585, 45 L.Ed.2d 623 (1975), as being limited to fixed checkpoints similar to that at San Clemente. Rather, *Ortiz* seems to me to hold that at *all* "traffic checkpoints removed from the border and its functional equivalents, officers may not search private vehicles without consent or probable cause." *Id.* at 2589. *See also Martinez-Fuerte*, 96 S.Ct. at 3087 ("checkpoint searches are constitutional only if justified by consent or probable cause to search"). *Ortiz*'s only qualification to its search prohibition is for instances where a warrant has been issued for the checkpoint, 95 S.Ct. at 2589 n. 3, on analogy to the suggestion of the five Justices in *Almeida-Sanchez v. United States*, 413 U.S. 266, 93 S.Ct. 2535, 2540, 2543–45, 2547, 37 L.Ed.2d 596 (1973), respecting warrants for roving patrols in particular areas. It seems plain that the concerns arising from the language and history of the warrant clause are somewhat less strongly implicated in the case of a fixed checkpoint than for a roving area patrol.

Thus, I conclude that we are not free to adopt Chief Judge Clark's persuasively reasoned view, and that Judge Reavley's path is the one we must follow.

PATRICK E. HIGGINBOTHAM, Circuit Judge, specially concurring:

I join Judge Reavley's opinion, but write separately to note my hesitation in the suggestion that an administrative warrant might properly issue on these facts.

First, it is not clear to me that the purpose of the checkpoint is administrative and not the enforcement of the criminal laws of the United States. It is true that a substantial percentage of the intercepted illegal aliens are not prosecuted, but the persons who transport them are frequently prosecuted and many illegal aliens are prosecuted if they are repeat offenders. Second, whatever the relevance in fourth amendment jurisprudence of the argument that the government has less restrictive alternatives, it is directly relevant to administrative warrants.

Of course, the Constitution is no straitjacket tying the hands of the United States and preventing it from protecting its borders. But while the difficulties that

attend our common border with Mexico are enormous, it is by no means a static problem—to the contrary. Only recently Congress made illegal the employ of illegal aliens. Until this legislation, the effectiveness of which is not reflected in the data before us, we maintained the curiously ambivalent policy of simultaneously making entry illegal and tolerating the legality of the most powerful attractive force for illegal entry—a job in the United States.

The dissent argues forcefully for the reasonableness of the right of full search at this checkpoint. The data utilized, however, do not tell us whether the success of the checkpoint depended upon the full search rights the dissent would give as opposed to investigatory stops contemplated by *United States v. Martinez-Fuerte,* 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976). *See also Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). While disclaiming labels, the dissent effectively suspends the operation of the fourth amendment and does so without the doctrinal justification of border searches. I find no precedent for that analysis, and I am not persuaded that the Supreme Court's approval of a state rule allowing a search without probable cause of a probationer's home or its approval of a warrantless inspection of an automobile junkyard are apposite. *See Griffin v. Wisconsin,* — U.S. —, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987); *New York v. Burger,* — U.S. —, 107 S.Ct. 2636, 96 L.Ed.2d 601 (1987).

The reasonableness of a search without a warrant must have a time, place, and situation dimension; while the dissent ably describes our present extraordinarily difficult immigration problems, the justification rests on a snapshot of ephemeral facts and is used to justify an open-ended suspension of the fourth amendment. The dissent cannot escape the brooding reality of accepting that every person traveling on an interstate highway of the United States, a major east-west artery to southern California, may be subjected to a full search at the sole discretion of a government agent without even articulable suspicion of wrongdoing. I respectfully disagree.

Perhaps administrative warrants will prove to offer the proper balance of these powerful competing interests. I reserve that judgment until we have the case. Perhaps the Supreme Court will balance in favor of a vehicular search for illegal aliens. But I will wait its reexamination of *United States v. Ortiz,* 422 U.S. 891, 95 S.Ct. 2585, 45 L.Ed.2d 623 (1975).

ROBERT MADDEN HILL, Circuit Judge, specially concurring:

I gladly concur in the court's removal of the "functional equivalent of the border" label from the Sierra Blanca checkpoint. As I have written before, I do not believe the Sierra Blanca checkpoint meets either the Supreme Court's suggested descriptions of a functional equivalent of the border or our own more-specific criteria for bestowing that label. *See United States v. Oyarzun,* 760 F.2d 570, 577 (5th Cir.1985) (Hill, J., specially concurring). I write separately, however, for several reasons.

### A.

The concept of a "functional equivalent of the border" is one not lacking theoritical and practical difficulties. Since coined by the Supreme Court in dicta in *Almeida-Sanchez,* 413 U.S. at 272, 93 S.Ct. at 2539, we have struggled to flush this label out. As Judge Reavley points out in an excellent overview of our authority, our opinions, much like the Rio Grande, have meandered from one reason or definition to another when attempting to support the functional equivalency label. *See supra* part I, at 854–857. *See also Oyarzun,* 760 F.2d at 577–79 (Hill, J., specially concurring) (our cases on functional equivalency have subtly expanded the concept beyond the Supreme Court's *dicta* in *Almeida-Sanchez* ).

If one returns to the Supreme Court's two examples in *Almeida-Sanchez* of functional equivalents, it could be argued that functional equivalency should be a matter of pure geography. That is to say, the point that can function as the equivalent of the border must in essence mirror the geo-

graphical border of the United States for all means of transportation and persons stopped there. Justice Stewart's example of the St. Louis airport receiving a non-stop flight from Mexico is the paradigm with which no one disagrees. The other example of two roads leading from the border which later converge at a single point presents the more difficult problem, for to give this example substantive effect, we may have to forego our absolute certainty that the persons and vehicles stopped at that point of convergence have actually crossed the United States border. Only if we read that example as entailing two roads which cross the border, which are not intersected by or joined with any purely domestic road, and which then converge at a point away from the border can we obtain the same certainty, as at the airport, that the persons and vehicles passing through the point of convergence have crossed the border.[1] Such a construction might very well as a practical matter eliminate the second of Justice Stewart's examples—it certainly eliminates Sierra Blanca as a functional equivalent of the border—for there are probably few points that geographically meet this standard. However, it seems to me that such a reading would prevent the creation of a "border zone" within which United States citizens, either living therein or passing through, are required to forfeit their Fourth Amendment rights.

Such a construction of a functional equivalent of the border setting would drastically reduce the government's ability to invoke the concept, and in light of the substantial entry of illegal aliens and contraband into the border area it is certainly one not often suggested. In an effort to accommodate the difficulties faced on the Texas/Mexico border, it appears we have focused on statistics rather than geography for determining functional equivalency. If we must reject a geographical construction of the concept, I would agree that the court's formulation of what is a functional equivalent represents a reasonable, but difficult, compromise.

Under the court's test functional equivalency turns "entirely on the nature of the traffic passing through the checkpoint." See supra part II, at 860. This standard is consistent with the Almeida-Sanchez examples since both emphasize the fact that the vehicles, persons, or effects being subjected to a "border search" at a point not actually the border of the United States have recently crossed the border. Pursuant to the court's standard, the label "functional equivalent of the border" can be bestowed only when the government establishes that the traffic passing through the checkpoint is "international" in character and that this international traffic so predominates in the figures for the total traffic flow through the checkpoint that we are assured that "no more than a negligible number of domestic travellers" are intercepted. See supra II, at 860.

The above test for functional equivalency will of course turn now on those things that some consider most despicable—statistics.[2] Because the type and amount of traffic flowing through a particular point now become the keys to unlocking the functional equivalency label for that point, my hesitancy with the court's opinion arises because it leaves these two elements vaguely defined. Concededly, a specific definition of either element is not needed to invalidate the Sierra Blanca checkpoint as a functional equivalent of the border for it cannot meet any reasonable construction of these terms. But we are, I believe, attempting to enunciate a workable standard for what is proper government conduct away from the border so as to protect the integrity of the border, to give guidance to the government, and to protect the citizenry; accordingly, it seems logical that we should say what these terms mean.[3]

---

1. It would seem that only one road would suffice as well, if combined with the other relevant geographical features mentioned.

2. Mark Twain, for example, is reported to have said when speaking about the evils of the world,

"There are lies, damn lies, and then there are statistics."

3. In footnote 4 of its opinion the court appears to recognize the importance statistics are to play in any future functional equivalency decision.

As for what is "international traffic," my reading of the court's opinion suggests we may be retreating from the definition contained in *Alvarez-Gonzalez II*. In *Alvarez-Gonzalez II* we stated that "international traffic" for functional equivalency purposes encompasses both vehicles and persons that have actually crossed the border and vehicles and persons that have begun their travels in the United States but near the border. *See Alvarez-Gonzalez II*, 561 F.2d at 624. We reasoned that the latter traffic, although domestic in nature, should nevertheless be considered international in fact because these travels began in an area close to the border and because we found such trips often were a method for smuggling aliens or contraband into the United States. *Id.* The court recognizes that the *Alvarez-Gonzalez II* definition of international traffic encompasses truly domestic traffic by United States citizens, which it certainly does, and then suggests that "[b]y including domestic traffic in our definition of international traffic, our cases have perverted the limiting principle inherent in the border search exception." *Supra* part II, at 858. Such a statement would seem to reject at least in part the *Alvarez-Gonzalez II* definition of international traffic.

Thus, as I understand the court's opinion, the focus of the international traffic element is: has the person stopped at a checkpoint crossed the border and not been subject to inspection. *See also Alvarez-Gonzalez II*, 561 F.2d at 627–28 (Goldberg, J., dissenting). If the person stopped has crossed the border and not been subject to inspection, regardless of whether the means of transportation the person presently occupies also crossed the border, the person is to be considered international traffic. If the person stopped, however, has not crossed the border then such person is not to be considered international traffic even though his present travel may

have originated near the border; such a person then is properly designated domestic traffic. If my understanding of our definition of international traffic is correct, the government should structure questions in its future surveys accordingly. The focus should be on people and whether they have crossed the border without being subject to inspection.

My second concern centers on what "a negligible number of domestic travellers" means within the context of the majority's test. Negligible is certainly a definable term but it is one of those words whose meaning depends upon the point of view of the person defining it. Generally it means an amount considered insignificant or that can be ignored as unimportant. *See The Random House Dictionary of the English Language* 956 (1969). The difficulty with the application of "negligible" in our formula of course is that the government may consider a 30 to 40 percent interdiction of domestic traffic "negligible" in light of its interest in combatting illegal alien and contraband smuggling. We however as the author of the term and as the arbitor of constitutional principles should be the body responsible with giving the word a substantive meaning. With the same concerns of promulgating a workable standard that gives the government guidance and the citizenry protection, I think we should define negligible more precisely.

We have in the past said that a 40% interdiction of domestic travel at the La Gloria checkpoint is permissible. *See Alvarez-Gonzalez II*, 561 F.2d at 623, 625. Prior to that we stated "anything approaching a majority percentage" of interdicted domestic traffic would be improper. *Alvarez-Gonzalez I*, 542 F.2d at 229. It would seem the court's "negligible" percentage standard goes back beyond even *Alvarez-Gonzalez I*'s threshold and certainly does not adhere to *Alvarez-Gonzalez II*'s notions about how much domestic travel may

The "well-crafted questions" it says are needed would seem to require us to tell future surveyors what should be the point of their questionaires. Without a clear definition of international traffic especially, we may either be condemning future survey efforts to irrelevance, like the

survey conducted in these cases, or delegating to the surveyors the responsibility of defining our own terms. It seems to me we should bear the responsibility for our own words and what they mean.

be stopped. In the end, however, and in the interest of a workable definition, we are destined to simply assign an actual numerical percentage to the term "negigible." By doing so the government thus would be spared the costs of setting up a checkpoint after a survey, having the checkpoint challenged, and then being told that the interdiction of 21 or 16, or whatever, percent of domestic travel as established in the survey is not negligible in our view. Concomitantly, if the government is told the minimum requirements necessary for a functional equivalent, the citizenry would not have to bear the burden of unconstitutional stops and searches that this after-the-fact evaluation process promotes.

The actual numerical percentage chosen while important is not as critical as the realization that sooner or later one must be selected. It seems to me we are in as good of a position as we will ever be to select what numerical amount of domestic traffic may be permissibly interdicted at a point designated the functional equivalent of the border. The percentage chosen of course will reflect how much we will compromise the fourth amendment rights of citizens in order to implement the functional equivalency concept.[4]

If my words convey nothing else they must be construed as expressing reluctance with the adoption of an unwieldy concept and our sometimes casual way of dealing with it. Once functional equivalency becomes dependent upon statistical analyzes

rather than a geographical setting, problems in addition to those addressed also arise, such as how long must a survey be conducted to determine the flow statistics, how long will a given survey be given effect, when should the survey be conducted, etc. While I may have more confidence in the science of statistics than others and may believe these problems and others can be managed, we are relegated to become more involved as statistical soothsayers than traditional judges in the area of functional equivalents of the border. This is a prospect I do not look forward to with any measure of comfort or assurance.

Nevertheless, agreeing that the Sierra Blanca checkpoint cannot be sustained as a functional equivalent of the border under any test, I concur in the court's withdrawal of that appellation.

### B.

Since Sierra Blanca cannot be sustained as a functional equivalent of the border, I agree further with the court's opinion that we must look elsewhere in Fourth Amendment jurisprudence to see if the searches conducted in these cases can be considered constitutional. My search ends with the Supreme Court's opinions in *United States v. Martinez-Fuerte*, 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976), and *United States v. Ortiz*, 422 U.S. 891, 95 S.Ct. 2585, 45 L.Ed.2d 623 (1975), for in those cases the Court has defined the powers of the government at permanent checkpoints [5],

---

4. Consonant with this view, I would suggest that the permissible percentage of domestic traffic interdiction would fall within a range of one to not more than ten percent. A number within this range would to me be consistent with the meaning of negligible.

5. In his able concurrence Chief Judge Clark would apparently abandon the use of all "labels" and adjudge all challenges on fourth amendment grounds with a "reasonableness" test. I do not believe, however, that labels and reasonableness are mutually exclusive notions. Labels can embody the very balancing of public and private interests that Chief Judge Clark says should occur in determining reasonableness. Especially when the Supreme Court has addressed factual situations and legal arguments similar to the situation we now address as a federal appellate court, our honest invocation of

the Court's label must embody the prior balancing performed by the Court itself.

Secondly, the Supreme Court has made labels important in this area of Fourth Amendment jurisprudence. Numerous classifications have been created, such as border searches, functional equivalent searches, extended border searches, permanent check points stops, and roving patrol searches. Each have their own requirements and each of them authorize different government actions. I feel therefore somewhat bound to utilize this general framework.

That is not to say however that a label cannot be misused or confusingly applied; our prior cases classifying Sierra Blanca as a functional equivalent of the border are examples of such applications. Nevertheless, if the substance of a label is understood and enunciated, I see nothing incongruous in applying it to a given situation as a sort of shorthand. The proper use of

such as Sierra Blanca, within this country. Under the teachings of these opinions the searches conducted in these cases were unconstitutional.

At permanent checkpoints the Supreme Court has stated that consonant with the Fourth Amendment the government may stop vehicles without suspicion, may question the persons inside the vehicle about their citzenship status, but that before any search of the persons or vehicle is undertaken the government officials must have either consent or probable cause to search. *See Martinez-Fuerte*, 428 U.S. at 567, 96 S.Ct. at 3087; *Ortiz*, 422 U.S. at 892, 95 S.Ct. at 2586. In these cases the government admits that searches, as that term is understood in the Fourth Amendment arena, occurred and it does not urge that the officers acted upon consent or probable cause in searching the defendants; accordingly, these searches were unconstitutional.

With this said I see no reason to join the court's extensive discussion on the possible viability and use of an "area warrant" in the Sierra Blanca locality. No area warrant has been issued in this case and I think the court speaks prematurely about the propriety of such warrants. To say the very least, the use of area warrants outside the narrow confines of administrative searches established by the Supreme Court raises the spectre of the general warrant of the pre-Revoluntionary period. It is undisputed that the Fourth Amendment was specifically adopted in reaction to the Crown's use of general warrants. Therefore, I see no reason to place this court's imprimatur on such a practice until the government actually attempts to utilize such a device. Accordingly, I do not join in part IV of the court's opinion.

### C.

Finally, I write briefly on the court's application of the good faith exception to the exclusionary rule in these cases. I agree with the court that the teachings of *Leon* and *Krull* apply to these cases, but I

do so while sharing Judge Rubin's concerns expressed in his concurrence. Application of the exception makes sense to me in these cases because this court in its prior opinion specifically authorized the conduct undertaken by the Border Patrol officials, i.e., the search of persons and vehicles at Sierra Blanca without any suspicion. Thus in these cases we stand in the shoes of the magistrate acting in *Leon* or the legislators involved in *Krull*. Outside of situations where we have authorized the specific conduct undertaken and then later declared it unconstitutional, I believe the analogy to *Leon* and *Krull* weakens and the exception should probably not be applied. Not to place such a limitation on the application of the exception would it seems to me transform the exception into the rule and would always deny to defendants the benefit of successfully litigating a Fourth Amendment claim when an officer claimed he was relying merely upon general caselaw in the Fourth Amendment area.

With these concerns and reservations, I concur in the affirmance of the defendants' convictions.

EDITH H. JONES, Circuit Judge, concurring specially:

I concur in Chief Judge Clark's reading of the applicable Supreme Court precedents and am thus persuaded that the Sierra Blanca checkpoint represents a novel location for analysis of the government's right to search vehicles for the purpose of enforcing our immigration laws. Unlike Judge Clark, however, I would urge the Court to authorize searches whose initial scope is confined to the problem tellingly documented by the government: illegal entry of aliens. *See also* 8 U.S.C. § 1357(a); 8 C.F.R. § 287.1(a)(2). It is unnecessary, ergo unreasonable, to address this problem by permitting at Sierra Blanca plenary searches of vehicles and private property contained therein. The proper constitutional balance, in my view, calls for an initial search of no more than major cavities of a

---

labels therefore can give appreciable guidance to government authorities as to how to obtain the given classification in another situation and

what powers and restrictions go along with the label, while at the same time informing the citizenry of their civil rights.

vehicle and its contents that might contain aliens. Should the officers, in the course of interrogating those who pass through the checkpoint or conducting this limited inspection, observe grounds that justify broader examination, we may deal with such cases as they arise. The behavior of the defendants and/or the condition of their vehicles in these cases, for instance, warranted such broader examination under accepted standards of fourth amendment reasonableness. *See, e.g., California v. Carney,* 471 U.S. 386, 105 S.Ct. 2066, 85 L.Ed.2d 406 (1985); *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925).