[Nos. 23970–8–I; 23971–6–I. Division One. September 17, 1990.]

The State of Washington, *Respondent,* v. Jerry W. Quick, *Appellant.*

The State of Washington, *Respondent,* v. June A. Winkle, *Appellant.*

*Timothy D. Kosnoff,* for appellants.

*Michael E. Rickert, Prosecuting Attorney,* for respondent.

PEKELIS, J.—Jerry Quick and June Winkle appeal their convictions for possession of a controlled substance. They contend that the trial court erred in denying their motion

to suppress evidence seized at the United States Customs checkpoint at Anacortes because the evidence was the product of an unlawful search. We reverse.

## I

On October 17, 1988, a Washington State ferry departed from Sydney, British Columbia, at around 1:11 p.m. Approximately 51 vehicles boarded the ferry. After leaving Sydney and crossing the United States–Canada border at sea, the ferry stopped in Friday Harbor at 2:25 p.m. Approximately 78 additional vehicles boarded the ferry. No customs inspection took place at Friday Harbor. The ferry did not stop again until it ended its run in Anacortes at approximately 3:48 p.m. Neither the vehicles nor the passengers boarding in Friday Harbor are segregated from those boarding in Sydney.

Jerry Quick and June Winkle, driving a 2–door Honda, were among those passengers who boarded the ferry at Friday Harbor. Upon arrival at the Anacortes ferry terminal, a United States Customs official stopped Quick and Winkle's car. He asked Quick where they boarded the ferry and Quick replied "Friday Harbor."

The customs official ordered Quick out of the car. At this point, he saw Winkle remove a green cloth bag from the glove box and place it between the seats. He then ordered Winkle out of the car and searched the interior compartment, including their luggage, Winkle's purse, and the glove box. Quick and Winkle were then taken into a search room and subjected to a full body search.

The official found two plastic pipes, several small baggies containing a white powder later identified as cocaine, one baggie containing a substance later identified as methamphetamine, a baggie containing four unidentified blue pills, and $1,070 in cash. The official called the Anacortes police and Quick and Winkle were taken into custody.

In January of 1989, the State charged Quick and Winkle with one count of possession of a controlled substance, to wit: cocaine. Quick filed a motion to suppress evidence

seized by the customs officials at Anacortes. No testimony was taken at the suppression hearing. The trial court treated the issue as one purely of law and denied the motion to suppress.

Following the suppression hearing, Quick and Winkle were tried on stipulated facts in the police reports. The trial court convicted them of possession of a controlled substance. They appeal.

## II

Quick and Winkle contend that the trial court erred in denying their motion to suppress evidence seized by customs officials at Anacortes. They assert that the search and seizure, conducted without a warrant or probable cause, violated their federal and state constitutional rights. The State responds that section 1467 of 19 U.S.C. authorized the search, or alternatively, that it was a valid search conducted at the functional equivalent of the border, at an extended border, or as a search with probable cause after a fixed checkpoint.

19 U.S.C. § 1467 provides:

> Whenever a vessel from a foreign port or place or from a port or place in any Territory or possession of the United States arrives at a port or place in the United States or the Virgin Islands, whether directly or via another port or place in the United States or the Virgin Islands, the appropriate customs officer for such port or place of arrival may, under such regulations as the Secretary of the Treasury may prescribe and for the purpose of assuring compliance with any law, regulation, or instruction which the Secretary of the Treasury or the Customs Service is authorized to enforce, cause inspection, examination, and search to be made of the persons, baggage, and merchandise discharge or unladen from such vessel, whether or not any or all such persons, baggage, or merchandise has previously been inspected, examined, or searched by officers of the customs.[1]

---

[1]Additionally, an implementing regulation, 19 C.F.R. § 162.6, provides:

"All persons, baggage, and merchandise arriving in the Customs territory of the United States from places outside thereof are liable to inspection and search by a Customs officer. District directors and special agents in charge are authorized to cause inspection, examination, and search to be made under section 467, Tariff Act of 1930, as amended (19 U.S.C. 1467), or persons, baggage, or merchandise,

██ Here, the ferry originated in a foreign port, Sydney, British Columbia, and its final destination was Anacortes, a port in the United States. We agree with the trial court that 19 U.S.C. § 1467 authorizes customs officials to search persons and vehicles crossing the border into the United States. *See United States v. Sheikh,* 654 F.2d 1057, 1068 (5th Cir. 1981); *United States v. Hernandez,* 639 F. Supp. 629, 632 (E.D.N.Y. 1986). Nonetheless, this statute does not and cannot obviate the requirement that a particular search or seizure be reasonable within the meaning of the fourth amendment to the federal constitution and article 1, section 7 of the Washington State Constitution.[2] *See Almeida–Sanchez v. United States,* 413 U.S. 266, 272, 37 L. Ed. 2d 596, 93 S. Ct. 2535 (1973) (although statute authorizes customs searches without probable cause or mere suspicion, no Act of Congress can authorize a violation of the constitution).

██ Customs officials may, without probable cause or a warrant, routinely search individuals crossing an international border to determine whether they are entitled to enter the country and to determine whether they are carrying contraband. *United States v. Ramsey,* 431 U.S. 606, 618, 52 L. Ed. 2d 617, 97 S. Ct. 1972 (1977). However, in order for a warrantless search conducted somewhere other than at the actual border to be constitutional, courts require other legal justification. *Ramsey,* 431 U.S. at 616.

The State first contends that the search is valid because Anacortes is the functional equivalent of the border. In recognition of the practical difficulty of conducting every

---

even though such persons, baggage, or merchandise were inspected, examined, searched, or taken on board the vessel at another port or place in the United States or the Virgin Islands, if such action is deemed necessary or appropriate."

[2]The Fourth Amendment provides:
"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause". U.S. Const. amend. 4.
    Article 1, section 7 of the Washington Constitution provides: "No person shall be disturbed in his private affairs, or his home invaded, without authority of law."

search at the exact moment a ship or vehicle crosses land or sea borders, courts have concluded that border searches may take place at the "functional equivalent of the border". *United States v. Alfonso,* 759 F.2d 728, 734 (9th Cir. 1985).

In determining whether a search occurred at the functional equivalent of the border, courts acknowledge the government's interest in searching those who cross international borders, yet they seek also to ensure that customs officials do not violate the constitutional rights of domestic travelers. Accordingly, though they employ somewhat different tests, federal courts uniformly require the government to demonstrate with reasonable certainty that the contraband or person seized has crossed an international border.

The Ninth Circuit requires "articulable facts to support a reasonably certain conclusion" that any contraband uncovered in the search was aboard the vehicle, vessel or aircraft when it entered the United States. *United States v. Potter,* 552 F.2d 901, 907 (9th Cir. 1977). Similarly, the Fifth Circuit requires the government to demonstrate with "reasonable certainty" that the traffic passing through the checkpoint is "'international in character'" and "intercept[s] no more than a negligible number of domestic travelers". *United States v. Jackson,* 825 F.2d 853, 860 (5th Cir. 1987); *see also United States v. Carter,* 760 F.2d 1568, 1576 (11th Cir. 1985) (there must be a reasonable certainty that the object of the search has just crossed the border).

The scant facts in this case do not permit us to conclude that Anacortes is the functional equivalent of the border. The State offered no evidence on this issue and the only finding remotely relevant to the issue is not helpful to the State. The trial court found that 51 vehicles boarded the ferry in Sydney and another 78 vehicles boarded in Friday Harbor. Hence, the traffic was certainly not "international in character," and the checkpoint intercepted more than a "negligible number" of domestic travelers. *See Jackson,* 825 F.2d at 860. Moreover, Quick and Winkle boarded at Friday Harbor. The State does not assert that they were

international travelers or that the contraband seized from them originated in Sydney.

Thus, on the record before us, we conclude that the functional equivalent of the border doctrine cannot be used to justify the customs official's search of Quick and Winkle or their car without probable cause.

■ The State also asserts that the search can be justified under the extended border doctrine. Like the functional equivalent of the border doctrine, this doctrine allows customs officials to conduct border searches before or after the border is actually crossed.[3] *United States v. Whiting,* 781 F.2d 692, 695 (9th Cir. 1986). Because these searches are more intrusive than searches at the border, they require "reasonable suspicion" that "the subject of the search was involved in criminal activity." *Whiting,* 781 F.2d at 695. The facts must be such

> as to convince the fact finder with reasonable certainty that any contraband which might be found in or about the vehicle at the time of the search was aboard the vehicle at the time of entry into the jurisdiction of the United States.

*Alfonso,* 759 F.2d at 735.

Just as under the functional equivalent of the border doctrine, the extended border doctrine requires a reasonable certainty that Quick and Winkle or the contraband crossed a border. The State did not present evidence that either was aboard the vessel when it crossed the border. Moreover, there is no evidence that the customs official who conducted the search reasonably suspected criminal activity. The customs official did not testify at the suppression hearing, and Quick and Winkle did not stipulate to the police reports until after the suppression hearing. Therefore, we conclude that the search, conducted without a

---

[3]Although some courts have sought to delineate differences between extended border searches and searches at the functional equivalent of the border, *e.g.,* *United States v. Niver,* 689 F.2d 520, 525–26 (5th Cir. 1982), others have noted the difficulty in making "sharp distinctions" between the two concepts. *See Alfonso,* 759 F.2d at 734.

warrant or probable cause, cannot be justified, on this record, under the extended border doctrine.

Finally, the State contends that Anacortes is a fixed checkpoint. The Supreme Court has recognized permanent fixed checkpoints as constitutionally valid and necessary in the interior of the United States where the government cannot effectively control the flow of illegal aliens at the border. *United States v. Martinez–Fuerte,* 428 U.S. 543, 546, 49 L. Ed. 2d 1116, 96 S. Ct. 3074 (1976).

In *Martinez–Fuerte,* the Supreme Court noted that "[t]hese checkpoints are located on important highways; in their absence such highways would offer illegal aliens a quick and safe route into the interior." 428 U.S. at 556–57. The Court relied on evidence showing the magnitude of the problem of the influx of illegal aliens entering the United States from Mexico. *Martinez–Fuerte,* 428 U.S. at 552. The Court explained that this situation arises because the two countries share a 2,000–mile border much of which is uninhabited desert or thinly populated arid land. *Martinez–Fuerte,* 428 U.S. at 552.

The Court concluded that, under these circumstances, the public interest is great enough and the intrusion limited enough to justify stops without even a reasonable suspicion of criminal activity. *Martinez–Fuerte,* 428 U.S. at 562. In these brief detentions ""[a]ll that is required of the vehicle's occupants is a response to a brief question or two and possibly the production of a document evidencing a right to be in the United States."" *Martinez–Fuerte,* 428 U.S. at 558. The Court made clear, however, that even at properly designated fixed checkpoints, although no suspicion is necessary for a stop, customs officials must have probable cause in order to conduct a search. *Martinez–Fuerte,* 428 U.S. at 567; *see also United States v. Ortiz,* 422 U.S. 891, 897, 45 L. Ed. 2d 623, 95 S. Ct. 2585 (1975).

On the record presented here, we cannot find that Anacortes is properly characterized as a "fixed checkpoint." Moreover, in order to conduct the search itself, the customs

officials needed probable cause. As we have noted previously, the State presented no evidence at the suppression hearing and the facts do not establish probable cause.

Accordingly, we reverse the trial court and remand for entry of an order granting Quick and Winkle's motion to suppress the illegally seized evidence.

GROSSE, A.C.J., and SCHOLFIELD, J., concur.