**UNITED STATES of America,**
**Plaintiff,**

v.

**Walter Jason GRAHAM, Defendant.**

No. CR00–191P.

United States District Court,
W.D. Washington.

June 21, 2000.

Bonnie E. MacNaughton, U.S. Attorney's Office, Seattle, WA, for plaintiff.

Robert M. Leen, Crowley Leen, Seattle, WA, for defendant.

## ORDER ON DEFENDANT'S MOTION TO SUPPRESS

PECHMAN, District Judge.

Defendant Walter Graham has moved to suppress evidence obtained by the Government during a search of his vehicle by a U.S. Customs Service inspector in Anacortes, Washington. It is undisputed that the search was conducted without a warrant or probable cause. However, the Government argues that the search was permissible because it took place at the "functional equivalent" of the United States border. In the alternative, the Government argues that Mr. Graham implicitly consented to the search.

The Court, having reviewed the briefing submitted by the parties and having conducted a suppression hearing, hereby GRANTS Defendant's motion for the reasons set forth below.

### Findings of Fact

On March 21, 2000, Mr. Graham boarded the "Evergreen State" ferry in Friday Harbor, Washington, driving a Lincoln Navigator. The ferry that Mr. Graham boarded had originated in Sidney, British Columbia. Passengers who had boarded the ferry in Sidney were not subject to inspection by the U.S. Customs Service in Canada, although a Customs Service official testified that these passengers were subject to immigration inspections in Canada.

The ferry first stopped at Friday Harbor, where new passengers boarded and others departed. Some passengers who had boarded the ferry at Sidney remained on the boat. These passengers were not inspected by the Customs Service at Friday Harbor. The ferry then continued to its final destination of Anacortes, Washington. There is no evidence indicating that the ferry crossed an international border while traveling between Friday Harbor and Anacortes. When the ferry arrived at Anacortes, all passengers on the ferry were required to submit to an inspection by the U.S. Customs Service, including those passengers who had first boarded the ferry in Friday Harbor. The evidence presented at the suppression hearing indicates that most of the ferry passengers who were subjected to inspection at Anacortes on March 21st had traveled entirely within the United States.

At Anacortes, Customs Inspector Carolyn Lockhart questioned Mr. Graham about where he had boarded the ferry. Mr. Graham indicated that he had boarded at Friday Harbor. The ferry ticket in Mr. Graham's possession indicated that he had purchased his ticket at 9:22 a.m. in Anacortes, which suggests that he had no opportunity to leave the country on March 21st. Ms. Lockhart conducted a visual

inspection of Mr. Graham's vehicle, asking him to roll down the windows because the glass was tinted. In the cargo hold of the vehicle, Ms. Lockhart noticed that a blanket covered a large object. Ms. Lockhart directed Mr. Graham to open the rear door of his vehicle, and Mr. Graham complied. In the cargo hold, Ms. Lockhart found that the blanket covered three large duffel bags. Ms. Lockhart searched these bags and discovered approximately 85 pounds of marijuana.

Ms. Lockhart did not have a warrant when she conducted the search, nor did she have probable cause to suspect that Mr. Graham's vehicle contained contraband. Furthermore, there is no evidence in the record indicating that Mr. Graham crossed the border at any time on March 21, 2000.

A Customs Service official testified that two general public announcements are normally made in the boarding area for the ferry at Friday Harbor which indicate that all passengers boarding the ferry will be subject to Customs inspection at Anacortes. Passengers waiting to board the ferry at Friday Harbor may park their cars and leave their vehicles prior to boarding. The ferry schedule also included a notice, under the heading "International Travel and Customs," which stated: "San Juan Islands[1] passengers boarding boats which originated in Sidney will also be subject to Customs inspection upon arrival in Anacortes." There is no evidence in the record that demonstrates that Mr. Graham saw or heard these notices.

On March 21, 2000, four ferries operated by the Washington State Department of Transportation traveled from Friday Harbor to Anacortes. The ferry that Mr. Graham boarded at 1:50 p.m. was the only ferry that day that originated in an international port; the other three only traveled between domestic ports. The ferries that travel exclusively between domestic ports are not subject to Customs inspections.

A U.S. Customs Service official testified that alternative means of ensuring that only international travelers were searched by Customs officials would be logistically more difficult or more costly than its current system of searching both international and domestic travelers at Anacortes.

### Conclusions of Law

The Government concedes that the search of Mr. Graham's vehicle did not take place at the actual United States–Canadian border. Moreover, the Government has presented no evidence that Mr. Graham crossed the border on March 21, 2000. However, the Government maintains that the Customs Service could permissibly search Mr. Graham's vehicle without a warrant, probable cause, or any reasonable certainty that Mr. Graham had actually crossed the border. In support of this argument, the Government maintains that the Customs inspection at Anacortes took place at the "functional equivalent" of the border. In the alternative, the Government argues that Mr. Graham implicitly consented to the search.

### 1. Searches at the Functional Equivalent of the Border

It is well-established that the Government does not need a warrant or probable cause to search individuals who seek to cross the U.S. border. As the Supreme Court has noted, border searches "have been considered to be 'reasonable' by the single fact that the person or item in question had entered into our country from outside." *United States v. Ramsey*, 431 U.S. 606, 619, 97 S.Ct. 1972, 52 L.Ed.2d 617 (1977). This exception to the Fourth Amendment "is grounded in the recognized right of the sovereign to control, subject to substantive limitations imposed by the Constitution, who and what may enter the country." *Id.* at 620, 97 S.Ct. 1972. For people and materials who cross the U.S. border, "[i]t is their entry into

---

1. Friday Harbor is located on one of the San Juan Islands.

this country from without it that makes a resulting search 'reasonable.'" *Id.*

In this case, however, Mr. Graham was subject to a warrantless border-type search despite the fact that he did not actually cross the U.S.–Canadian border. Instead, like many other passengers who were subject to Customs inspection at Anacortes, his journey on the Evergreen State was entirely within the United States.

■ The Government argues that the search of Mr. Graham's vehicle was proper because it allegedly took place at the "functional equivalent" of the border. Courts have recognized that in some situations, it is not feasible to conduct a search at the actual border. As such, the Government may, in proper circumstances, conduct a warrantless search at a point deemed to be the functional equivalent of the border. *See, e.g., Almeida–Sanchez v. United States,* 413 U.S. 266, 272, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973) (noting that routine border searches "may in certain circumstances take place not only at the border itself, but at its functional equivalents as well"). For example, passengers aboard a plane traveling directly from Mexico City to St. Louis need not be searched at the moment the plane crosses the border. Instead, passengers may be searched at the St. Louis airport, which serves as the functional equivalent of the border. *Id.* at 273, 93 S.Ct. 2535.

■ Under the circumstances presented here, however, the Government has little basis to argue that the search of Mr. Graham's car at Anacortes took place at the functional equivalent of the border. As the Fifth Circuit has noted, "only searches of persons or effects that have crossed the border may be deemed functionally equivalent to border searches and hence be excepted from the Fourth Amendment's compass." *United States v. Jackson,* 825 F.2d 853, 859 (5th Cir.1987). Put more simply, "an actual border cross-

ing must have occurred to justify a search." *Id.*

Therefore, the court in *Jackson* held that "[t]o justify searches at checkpoints labeled the functional equivalent of the border the government must demonstrate with 'reasonable certainty' that the traffic passing through the checkpoint is 'international' in character." *Id.* at 860; *see also United States v. Santiago,* 837 F.2d 1545, 1548 (11th Cir.1988) (noting that "reasonable certainty that the border was crossed" is a factor in determining whether a search has occurred at the functional equivalent of the border). This test requires that the government demonstrate "that border equivalent checkpoints intercept no more than a negligible number of domestic travelers." *Jackson,* 825 F.2d at 860.

Mr. Graham did not cross the border on March 21st. Moreover, the evidence demonstrates that the U.S. Customs Service intercepts far more than a negligible number of domestic travelers at Anacortes. Indeed, the evidence before the Court indicates that a majority of passengers who were required to submit to Customs inspection at Anacortes on March 21st were domestic travelers. As a result, Anacortes cannot be regarded as the functional equivalent of the border in this case.

The Government suggests that this case is analogous to a line of cases in which courts have held that packages or other objects shipped into the United States do not need to be searched at their first stop within this country. Courts have held that, under proper circumstances, such packages can be searched at their final destination, which would be regarded as the "functional equivalent" of the U.S. border, rather than at their initial stopping point in the country. *See United States v. Gaviria,* 805 F.2d 1108, 1113–14 (2d Cir. 1986); *United States v. Caminos,* 770 F.2d 361, 363–65 (3d Cir.1985); *United States v. Sheikh,* 654 F.2d 1057, 1067–70 (5th Cir. Unit A Sept.1981); *United States v. Galla-*

*gher,* 557 F.2d 1041, 1042–44 (4th Cir. 1977).

However, the "package" cases cited by the Government are readily distinguishable from the facts presented here. Most notably, it was undisputed in each of the cases cited by the Government that the object in question had actually crossed the U.S. border. Here, by contrast, it is undisputed that Mr. Graham did *not* cross the U.S. border. This fact alone is sufficient to distinguish the cases cited by the Government. Moreover, the courts in each of the cases cited by the Government noted that the final destination of the packages could be regarded as the functional equivalent of the border because measures were taken to ensure that the objects were not materially changed after they entered the United States. Here, there is no evidence that such steps were taken.

The Government also points to 19 U.S.C. § 1467 ("Section 1467") to justify its position. This statute, which was adopted as part of the 1930 Tariff Act, provides:

> Whenever a vessel from a foreign port or place or from a port or place in any Territory or possession of the United States arrives at a port or place in the United States or the Virgin Islands, whether directly or via another port or place in the United States or the Virgin Islands, the appropriate customs officer for such port or place of arrival may, under such regulations as the Secretary of the Treasury may prescribe and for the purpose of assuring compliance with any law, regulation, or instruction which the Secretary or the Customs Service is authorized to enforce, cause inspection, examination, and search to be made of the persons, baggage, and merchandise discharged or unladen from such vessel, whether or not any or all such persons, baggage or merchandise has previously been inspected, examined, or searched by officers of the customs.

This statute is seventy years old. However, the Government is unable to offer a single case in which a court has held that this statute may be constitutionally applied to permit Customs officials to conduct warrantless searches of passengers who board a vessel in the United States and depart from the vessel at another port in the United States, without ever crossing the U.S. border.

Indeed, there are very few cases interpreting the constitutionality of Section 1467. Among the decisions cited by the parties, the most thorough discussion is contained in *State v. Quick,* 59 Wash.App. 228, 796 P.2d 764 (1990). Significantly, the court in *Quick* was confronted with facts very similar to those presented here and reached a conclusion contrary to the Government's position.

In *Quick,* a ferry had departed from Sidney, British Columbia, and traveled to Friday Harbor, where the defendants boarded. The ferry then traveled to Anacortes, where defendants were subjected to a search by Customs officials which uncovered illegal drugs. In response to defendants' motion to suppress, the State argued that Anacortes could be regarded as the functional equivalent of the border. The court squarely rejected this argument, noting:

> In determining whether a search occurred at the functional equivalent of the border, courts acknowledge the government's interest in searching those who cross international borders, yet they seek also to ensure that customs officials do not violate the constitutional rights of domestic travelers. Accordingly, though they employ somewhat different tests, federal courts uniformly require the government to demonstrate that the contraband or person seized has crossed an international border.

*Id.* at 233, 796 P.2d at 767. The court further noted that the traffic on the ferry clearly was not "international in character" and that it "intercepted more than a 'negligible number' of domestic travelers." *Id.* Therefore, the court held that "on the

record before us, we conclude that the functional equivalent of the border doctrine cannot be used to justify the customs official's search of [defendants] or their car without probable cause." *Id.* at 234, 796 P.2d 764, 796 P.2d at 767.

The Government argues that the *Quick* decision was based on a limited record and should not be regarded as persuasive. However, the Government offers little to distinguish the facts in *Quick* from the facts presented here. The only significant factual difference is that the record here shows that some general attempts were made to notify passengers boarding the ferry in Friday Harbor that they would be subject to Customs inspection in Anacortes. The Court addresses this distinction below. Moreover, while *Quick* is not controlling here, the Court agrees with the reasoning of the decision and finds that the decision is more on point than any case law cited by the Government.

Therefore, the Court concludes on the record before it that the search of Mr. Graham's car cannot be justified on a theory that the search occurred at the functional equivalent of the border.

## 2. Implied Consent to Search

In the alternative, the Government argues that Mr. Graham implicitly consented to the search of his vehicle because he could or should have known that passengers boarding the Evergreen State at Friday Harbor would be subject to Customs inspection at Anacortes. A Customs official at Friday Harbor testified that two general announcements are normally made to passengers in the boarding area at Friday Harbor indicating that passengers boarding the ferry would be subject to Customs inspection in Anacortes. A similar notification is also provided on the ferry schedule issued by the Washington State Department of Transportation. The Government further notes that Mr. Graham could have taken a later or earlier ferry from Friday Harbor and Anacortes on March 21st which did not originate in

Canada, and thus was not subject to inspection by the Customs Service. As such, they maintain that Mr. Graham made a voluntary decision to choose to travel on the one "international" ferry from Friday Harbor to Anacortes on March 21st that subjected domestic travelers to Customs inspection. As a result, the Government argues that Mr. Graham had ample notice that he would be subject to search at Anacortes and implicitly consented to the search by boarding the "international" ferry rather than one of the "domestic" ferries.

■■■ "The existence of consent to a search is not lightly to be inferred, and is a question of fact to be determined from the totality of circumstances." *United States v. Patacchia,* 602 F.2d 218, 219 (9th Cir. 1979). "[T]he government bears the burden of proving 'consent.'" *United States v. Davis,* 482 F.2d 893, 914 (9th Cir.1973). Moreover, "[t]his burden is heavier where consent is not explicit." *United States v. Impink,* 728 F.2d 1228, 1232 (9th Cir. 1984).

In addition, "[c]ourts confronted with claims of implied consent have been reluctant to uphold a warrantless search based simply on actions taken in the light of a posted notice." *McGann v. Northeast Illinois Regional Commuter R.R. Corp.,* 8 F.3d 1174, 1180 (7th Cir.1993). In *McGann,* the court observed that a "sign's blanket statement that a person 'is subject to search' ... does not readily inform the person of the grounds for the search, the extent of the search or the frequency or regularity of the searches. The person's conduct therefore does not clearly establish that the person consented to the particular search in question." *Id.*

■■■ Under the totality of the circumstances here, the Court does not find that the Government has met its burden of proving that Mr. Graham implicitly consented to the search of his vehicle. The notice in the ferry schedule indicated that "San Juan Islands passengers boarding

boats which originated in Sidney will also be subject to Customs inspection upon arrival in Anacortes." This notice is not prominent and could be easily missed. It is under the heading "International Travel and Customs" and is not likely to be read by those engaged in domestic travel. The notice provides little information about the extent of the search or the grounds for the search. Moreover, there is no certainty that passengers boarding the ferry will actually see or read the ferry schedule. Similarly, there is no reasonable assurance that all passengers will hear or understand the import of general public announcements made in the ferry boarding area, nor is there any evidence in the record regarding the specific wording of the announcements. Moreover, ferry passengers may simply park their cars in the boarding area and leave the area prior to boarding. The evidence put forth by the Government is insufficient to demonstrate that Mr. Graham implicitly consented to the search at issue here.

■ The Government analogizes the search of passengers departing at Anacortes to the sort of searches that take place routinely at airports and courthouses. Such searches have been upheld by the Ninth Circuit as permissible "administrative" searches designed to advance compelling government interests. *See McMorris v. Alioto,* 567 F.2d 897, 899–901 (9th Cir.1978) (Kennedy, J.) (courthouse searches); *United States v. Davis,* 482 F.2d 893, 913 (9th Cir.1973) (airport searches). These decisions "sustained limited searches of persons seeking to enter sensitive facilities" as an exception to the Fourth Amendment. *McMorris,* 567 F.2d at 899. The *McMorris* court emphasized that "[c]are must be taken so that the exception is not unduly extended." *Id.* Courts give "strict scrutiny to any system used to screen persons entering a public place." *Id.* Such searches "must be clearly necessary to secure a vital governmental interest, such as protecting sensitive facilities from a real sense of violence" and

"must be limited and no more intrusive than necessary to protect against the danger to be avoided, but nevertheless reasonably effective to discover the materials sought." *Id.*

The Court does not find that the search of Mr. Graham's car to be a permissible administrative search under the principles of *Davis* and *McMorris.* Searches at airports and courthouses are intended to prevent persons from carrying weapons or explosives aboard an aircraft or into a courthouse. Such limited searches are narrowly designed to prevent violence in sensitive facilities by the least intrusive means feasible.

The searches by the Customs Service that take place at Anacortes are designed, *inter alia,* to prevent contraband from entering this country. This may certainly be regarded as a legitimate and important state interest. As the Government notes, passengers who board the Evergreen State at Friday Harbor may commingle with passengers who boarded the ferry in Canada. Since the passengers who boarded in Canada had not cleared customs prior to entering this country, they could conceivably pass contraband from Canada to domestic travelers who boarded at Friday Harbor. As such, the Government argues that it is necessary to search all departing passengers at Anacortes in order to prevent contraband from entering the country.

However, subjecting domestic travelers to warrantless searches at Anacortes is not a narrowly tailored means of advancing this goal, nor would such searches appear to be "clearly necessary." For instance, it seems apparent from the record that the Government could conduct Customs inspections of passengers *before* they board the ferry in Sidney. The testimony at trial establishes that such "pre-clearance" inspections may be conducted by Customs officials on Canadian soil. If such inspections were conducted in Canada, there would be no need for the Customs Service to conduct searches of both international

and domestic travelers in Anacortes. While the Government maintains that "pre-clearance" inspections in Canada would be more expensive than searching all departing passengers at Anacortes, the Court notes that a Customs Service official testified that U.S. Immigration inspects ferry passengers at Sidney. The record before the Court therefore suggests that Customs Service could conduct its inspections in Canada as U.S. Immigration apparently already does.

In addition, it would appear to be possible to conduct Customs inspections of all international travelers either by: (1) onboard inspections before the ferry lands in Friday Harbor; or (2) at Friday Harbor. It may also be possible to segregate international travelers from domestic travelers on the ferry. While the testimony indicates that these measures would pose logistical difficulties, "convenience" to the Government is not the touchstone for Fourth Amendment analysis. *See, e.g., United States v. Taylor*, 934 F.2d 218, 220 (9th Cir.1991) ("We recognize that individual interests outrank government convenience in the fourth amendment balancing"). The Government cannot justify warrantless searches of domestic travelers on the grounds that such searches are cheaper or more convenient than more narrowly tailored methods of ensuring that contraband does not enter the country.

Therefore, the Court rejects the Government's argument that Mr. Graham implicitly consented to a legitimate administrative search.

### Conclusion

For the foregoing reasons, the Court hereby GRANTS Defendant's motion to suppress evidence that the Government obtained through the search of Defendant's vehicle at Anacortes, Washington. The Government may not introduce such evidence obtained from this search or the fruits of such evidence at trial.

The clerk is directed to send copies of this order to all counsel of record.